## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| **ERIC J. DEPAOLA,** | ) | |
| Plaintiff | ) | Civil Action No.: 7:12cv00139 |
| | ) | |
| v. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| **TRACY RAY, et al.,** | ) | By: PAMELA MEADE SARGENT |
| Defendants | ) | United States Magistrate Judge |

The pro se plaintiff, Eric J. DePaola, is a Virginia Department of Corrections, ("VDOC"), inmate currently housed at Red Onion State Prison, ("ROSP"). This case is before the court on the Motion For Summary Judgment of the defendants[1] Tracy Ray, Richard Rowlette, Major K. McCoy, Delmer Tate, Lieutenant Gilbert, John Garman, VDOC, Sergeant Collins, Sergeant Hartsock, Corrections Officer Phipps, Corrections Officer Wood and Corrections Officer Davis, (Docket Item No. 27) ("Motion"). None of the parties have requested a hearing. The motion is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). The undersigned now submits the following report and recommended disposition.

### I. Facts & Procedural History

DePaola brings this civil rights action pursuant to 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act, ("RLUIPA"), 42 U.S.C. §

---

[1] By order entered June 15, 2012, the court dismissed James Wade as a defendant in this matter. (Docket Item No. 3.)

2000cc *et seq.* In Count I of his Complaint,[2] (Docket Item No. 1) ("Complaint"), DePaola claims that Ray, Rowlette, McCoy, Tate, Gilbert and the VDOC violated his Eighth Amendment and Fourth Amendment rights by placing him in the B-3 pod at ROSP for approximately two and one-half months where offenders were (1) subjected to strip searches in a cage in the pod while female employees watched; (2) denied personal televisions; (3) not allowed to shave with razors in the showers three times weekly; (4) without power or cable outlets in their cells, a toilet that the offender could flush himself or a shelf and desk in the cell; (5) moved from cell to cell periodically; (6) kept behind solid boxed car door cells; and (7) subjected to other restrictions not experienced by ROSP segregation offenders not assigned to the B-3 pod. DePaola also claims that Ray, Rowlette, McCoy and Tate violated his Fourteenth Amendment due process rights by placing him in the B-3 pod without a hearing. (Complaint at 7-15.)

In Count II of the Complaint, DePaola claims that Ray, Rowlette, McCoy, Tate and the VDOC violated his rights under the First Amendment and RLUIPA when he could not hear the Jumu´ah services,[3] which were shown on the B-3 pod television because the sound was muted, and the images were distorted by a pod light shining onto the wall. (Complaint at 15-16.)

In Count III of the Complaint, DePaola claims that Collins, Phipps, Hartsock, Gilbert, Wood and Davis violated his Eighth Amendment rights by

---

[2] DePaola filed a Motion For Leave To File An Amended Complaint, (Docket Item No. 17), which was granted, but only insofar as it sought additional or modified relief or damages as a result of the claims raised in the original Complaint. (Docket Item No. 25).

[3] Jumu'ah is a congregational prayer that Muslims hold every Friday, just after noon in the place of the noon prayer. Attendance is strictly incumbent upon adult males who are legal residents of a given locality. *See* http://en.wikipedia.org/wiki/Jumu'ah (last visited July 19, 2013).

placing and/or keeping his restraints on too tightly during a transport to a court hearing on March 22, 2011, keeping him in a hot van after transporting him to court, not providing him a beverage with his lunch or allowing him to get a drink and not allowing him to use the restroom. DePaola also claims that Phipps, Hartsock, Wood and Davis violated his rights under the First Amendment and RLUIPA because he could not pray according to his religious beliefs because he was kept restrained in the van. (Complaint at 16-20.) In particular, DePaola argues that his Islamic faith requires him to pray five times daily and that he is obligated to perform "wudu" before praying. Wudu is a process of cleaning oneself before prayer. DePaola argues that because he was restrained in the transport van for seven and one-half hours, he was unable to perform the mandatory wudu, and he missed two of the obligatory daily prayers during that time. (Docket Item No. 31, (Memorandum in Opposition Of Defendants' Motion For Summary Judgment), at 15.) DePaola further alleges that Gilbert and Collins violated his rights under the Fourth Amendment by subjecting him to a strip search in the cage in the B-3 pod prior and/or subsequent to his transport to this court hearing. (Complaint at 20-21.)

DePaola claims that Garman violated his First, Fourth, Eighth and Fourteenth Amendment rights by upholding the defendants' actions during the grievance process. (Complaint at 23.)

On February 10, 2011, DePaola filed an Informal Complaint alleging that he was moved to the B-3 pod where there was no desk or shelf in the cell; that he could not flush his own toilet; that he was searched three times when leaving his cell; that he could not have a television in his cell; that he could not shave in his cell; that a window flap was closed during inmate movement; that he was under extreme surveillance; and that he was given a full body x-ray before he entered his

pod. (Docket Item No. 7 at 12.) Tate responded to this complaint, stating that DePaola was provided with property bags in which to store his property; that barber services were provided every Sunday; and a projection television was provided to him in the pod. (Docket Item No. 7 at 12.) An Offender Grievance Response form indicates that DePaola's complaint was again responded to, stating that a piece of belt was available to be issued for the purpose of writing; that all cells are designed with a flush valve; that he was provided with a property storage bag for storage; that barber services were available every Sunday; that the television is on the wall in the pod; that strip search was applied per procedure; that the window flap was closed for safety purposes; and that he was housed in a safe, secure environment in a segregation pod. (Docket Item No. 7 at 14.)

On February 15, 2011, DePaola filed an Informal Complaint alleging that he was unable to view religious services required by his Muslim religion. (Docket Item No. 7 at 8.) McCoy responded to this complaint, stating that several inmates practiced their faith without having a television. He stated that the Chaplain would be able to assist DePaola with this matter and that DePaola could contact his Unit Manager because they wanted DePaola to be able to practice his faith. (Docket Item No. 7 at 8.) An Offender Grievance Response form states that a projection television was provided for the offenders in the B-3 pod with closed captioning and that the Chaplain was available to assist DePaola in religious matters. (Docket Item No. 7 at 10.)

On March 23, 2011, DePaola filed an Inmate Request for Information/Service form indicating that on March 22, 2011, he was transported to the Wise County Courthouse at 8:15 a.m. and was left in extremely tight handcuffs and flex cuffs until approximately 3:30 p.m., while having to sit in a van in

extremely hot and humid conditions. (Docket Item No. 31, Exhibit N.) He stated that he experienced lightheadedness, nausea, headaches and bruising to his wrists, with tingling in his right thumb and index finger. (Docket Item No. 31, Exhibit N.) An Offender Grievance Response form indicates that Captain Turner investigated these complaints and found that DePaola had been properly restrained. (Docket Item No. 7 at 6.) A medical report dated March 22, 2011, indicates that DePaola was treated for low back pain and rhinitis.[4] (Docket Item No. 31, Exhibit B.) On March 24, 2011, DePaola filed an Emergency Grievance form stating that he had tingling with lack of sensation in his right thumb and index finger and that his wrists were bruised due to his restraints being placed on too tightly. (Docket Item No. 31, Exhibit O.) On March 28, 2011, a nurse examined DePaola for his complaints of right hand numbness and noted bruises on his right wrist. He was referred to a physician. (Docket Item No. 31, Exhibit P.) On March 29, 2011, a physician saw DePaola for his complaints of numbness in his right hand. He denied problems with his left wrist. The physician noted no bruising or swelling in the right hand and subjective numbness in the thumb and index finger. (Docket Item No. 31, Exhibit Q.) DePaola was diagnosed with probable neuropathic pain. (Docket Item No. 31, Exhibit Q.)

DePaola has provided a memorandum dated April 19, 2012, from Warden Mathena wherein immediate changes were introduced to the operating procedures for special housing. (Docket Item No. 31, Exhibit A.) Operating Procedure 861.3, Section V was amended to add that "A strip search shall be conducted on each offender before exiting a Special Housing Unit cell and then a frisk search shall be

---

[4] The medical report is dated the same day that DePaola was transported to the Wise County Courthouse and fails to indicate that DePaola complained of wrist pain or that he reported to the attending physician that his restraints had been placed on him too tightly.

conducted immediately after restraints are applied and the offender removed from the cell." (Docket Item No. 31, Exhibit A.) This procedure also was amended to add "A frisk search shall be conducted prior to returning the offender to a Special Housing Unit cell." (Docket Item No. 31, Exhibit A.)

DePaola also submitted a copy of a settlement agreement which appears to have been introduced in a class action suit before the United States District Court for the Eastern District of Virginia in April 1985 that presumably concerned the conditions of confinement of death row inmates at Mecklenburg Correctional Center. (Docket Item No. 32, Exhibit S.) DePaola contends that this settlement agreement is evidence against the defendants' request for qualified immunity. (Docket Item No. 32 at 2.)

Ray, the former Warden of ROSP, filed an affidavit in support of his Motion for Summary Judgment, (Docket Item No. 27, Exhibit I), ("Ray Affidavit"). He stated that the B-3 pod was developed in 2010 to make ROSP a safer environment for staff and offenders. (Ray Affidavit at 1.) Ray stated that the B-3 pod was developed with security enhancements that met all standards of the American Correctional Association, ("ACA"). (Ray Affidavit at 1-2.) These security enhancements included, but were not limited to, the following: strip search performed outside of the cell with the offender inside of a strip search cage; offenders were not allowed to keep exchange clothing in their cell; for recreation, offenders were placed in individual cages within the recreation yard, but they were spaced out; offenders could view television on the wall inside the pod; offenders were escorted to the showers and then back to their cells, but were strip searched before reentering the cell; toilets in the cells had a flush valve operated by staff in

pod; and offenders were allowed to view religious services on the television inside the pod. (Ray Affidavit at 2.)

Ray stated that all practices exercised for the B-3 pod were done so to make the pod a safer environment and did not remove or prevent offenders from any services they previously had. (Ray Affidavit at 2.) He stated that it also did not grant offenders any rights to services from which they already were restricted. (Ray Affidavit at 2.) Ray stated that the primary mission of ROSP is administrative segregation. (Ray Affidavit at 2.) He stated that it is composed of 19 administrative segregation pods, three progressive housing pods and two cadre pods. (Ray Affidavit at 2.) He stated that, while the security in the B-3 pod was enhanced, it was not enhanced to the degree that it interfered with or violated offenders' rights. (Ray Affidavit at 2.)

Ray stated that DePaola first arrived at ROSP in February of 2007. (Ray Affidavit at 3.) He stated that DePaola was housed in the B-3 pod on February 7, 2011, and was removed from this pod on April 18, 2011. (Ray Affidavit at 3.) DePaola was recommended for assignment to the B-3 pod based on his overall conduct. (Ray Affidavit at 3.) Ray stated that during DePaola's entire tenure in the VDOC, he had received more than 20 institutional infractions. (Ray Affidavit at 3.) DePaola's placement into the B-3 pod was based on the frequency, severity and trend of his misconduct. (Ray Affidavit at 3.)

Ray stated that offenders in the B-3 pod were allowed to watch religious services on the television provided in the pod. (Ray Affidavit at 3.) He stated that this television was a projector television without sound and with closed captioning. (Ray Affidavit at 3.) However, Ray stated that because Jumu´ah services were on

DVD, closed captioning was not available. (Ray Affidavit at 3.) Nonetheless, he stated that DePaola was allowed to practice his religious faith in other ways, including reading his religious materials, speaking with the facility Chaplain, participating in a common fare diet, if applicable, and praying. (Ray Affidavit at 3.)

Rowlette, the former Assistant Warden at ROSP, filed an affidavit in support of his Motion for Summary Judgment, (Docket Item No. 27, Exhibit II), ("Rowlette Affidavit").  He stated that the B-3 pod was created to make ROSP a safer environment for staff and offenders. (Rowlette Affidavit at 1.) He stated that offenders housed in the B-3 pod still had access to the showers, recreation, etc., at the same frequency as before or in any other segregation pod. (Rowlette Affidavit at 1.) Rowlette stated that he was one of several staff members at ROSP who met to discuss various offenders' placement into the B-3 pod. (Rowlette Affidavit at 1.) He stated that DePaola was selected by a panel of staff at ROSP who voted on his placement into the pod. (Rowlette Affidavit at 2.) Rowlette stated that he did not create or implement any new policy that allowed for strip searches of offenders. (Rowlette Affidavit at 2.)

McCoy, a former Major at ROSP, filed an affidavit in support of his Motion for Summary Judgment, (Docket Item No. 27, Exhibit III), ("McCoy Affidavit"). McCoy stated that he was one of several staff members at ROSP who met to discuss various offenders' placement into the B-3 pod. (McCoy Affidavit at 1.) He stated that the B-3 pod was created to make sure offenders were managed and that everyone at ROSP, including staff, were in a safe and healthy living environment. (McCoy Affidavit at 1.) McCoy stated that offenders housed in the B-3 pod received the same amount of recreation, showers, medical treatment, attorney

access, etc., as other offenders in the other segregation pods. (McCoy Affidavit at 1-2.) He stated that DePaola was selected by a panel of staff at ROSP who voted on his placement into the pod. (McCoy Affidavit at 2.) McCoy stated that he did not create or implement any new policy that allowed for strip searches of offenders. (McCoy Affidavit at 2.)

Tate, a Captain at ROSP, filed an affidavit in support of his Motion for Summary Judgment, (Docket Item No. 27, Exhibit IV), ("Tate Affidavit"). Tate stated that offenders were moved into the B-3 pod for a number of security reasons and that DePaola was selected by a panel of staff at ROSP which included security, treatment and mental health personnel. (Tate Affidavit at 1.) Tate stated that he did not create or implement any new policy that allowed for strip searches of offenders. (Tate Affidavit at 2.) He stated that the strip search procedure in the B-3 pod provided the same visual body inspection that an offender would undergo in his cell with the exception that it was conducted inside a strip cell cage outside of the offender's cell. (Tate Affidavit at 2.) During a strip search, offenders are required to remove all of their clothing, and a visual examination is conducted of the offender's head, hair, mouth, torso, pelvic area, legs and feet. (Tate Affidavit at 2.) Offenders are instructed to spread their legs, bend over, spread their buttocks, squat and cough and raise their arms, penis and scrotum during the visual inspection, after which, the offenders' clothes are returned in order for them to get dressed. (Tate Affidavit at 2.)

Tate stated that religious and educational programming is available on the B-3 pod television from 6:00 a.m. to 6:00 p.m., after which time standard cable programming is available. (Tate Affidavit at 2.) He stated that he does not decide which programming is offered to the offenders. (Tate Affidavit at 2.) Tate stated

that tables, shelves and mirrors are not contained in the B-3 pod cells for security reasons. (Tate Affidavit at 2.) He also stated that all cells are cleaned prior to placement of an offender into the cell and that offenders are given the opportunity to clean the cells themselves. (Tate Affidavit at 2.)

Hartsock, a Sergeant at ROSP, filed an affidavit in support of his Motion for Summary Judgment, (Docket Item No. 27, Exhibit V), ("Hartsock Affidavit"). He stated that he recalled transporting DePaola to the Wise County Courthouse on or about March 22, 2011. (Hartsock Affidavit at 1.) Hartsock stated that prior to the transport, DePaola was taken to the intake receiving area where he was put in restraints to be transported. (Hartsock Affidavit at 1.) These restraints consisted of handcuffs, waist chains, leg irons and a security box. (Hartsock Affidavit at 1.) Hartsock stated that this was standard procedure when escorting any offender unless additional restraints were ordered per the warden. (Hartsock Affidavit at 1.) Hartsock stated that he recalled restraining DePaola, but that he did not remember DePaola telling him that his restraints were too tight. (Hartsock Affidavit at 1-2.) Hartsock also denied that he told DePaola that the way the restraints were applied was per policy and that he would get used to them once they got on the road. (Hartsock Affidavit at 2.) He stated that to make certain that the restraints were not too tight, he would slip his middle finger in between the restraint and the offender's wrist or ankle, and, if he was able to do so, they were considered to have been applied properly. (Hartsock Affidavit at 2.)

Hartsock stated that when he arrived at the courthouse, he turned in all paperwork to the court clerk, who dockets the offender's information and calls the case accordingly. (Hartsock Affidavit at 2.) He stated that they did not go into the court building until the court clerk called them or unless an offender had to use the

restroom. (Hartsock Affidavit at 2.) Hartsock stated that he did not recall if DePaola went to the restroom on this particular day, but if he asked, he was escorted to the restroom. (Hartsock Affidavit at 2.) He stated that there is a water fountain located outside of the restroom where DePaola would have been able to get a drink. (Hartsock Affidavit at 2.) He stated that he did not tell DePaola that he would have to wait until he returned to the institution in order for him to have something to drink. (Hartsock Affidavit at 2.) Hartsock stated that the van was running with the air conditioning on throughout the wait. (Hartsock Affidavit at 2.)

Phipps, a Corrections Officer at ROSP, filed an affidavit in support of her Motion for Summary Judgment, (Docket Item No. 27, Exhibit VI), ("Phipps Affidavit"). Phipps stated that she did not specifically recall transporting DePaola to the Wise County Courthouse on March 22, 2011, nor did she recall him telling her that his cuffs were too tight. (Phipps Affidavit at 1-2.)

Davis, a Corrections Officer at ROSP, filed an affidavit in support of his Motion for Summary Judgment, (Docket Item No. 27, Exhibit VII), ("Davis Affidavit"). He stated that, although he did not specifically recall transporting DePaola to the Wise County Courthouse, he could state that he had never left an offender inside of a hot van. (Davis Affidavit at 1.) He stated that, if the temperature was hot outside, the transportation van would have been running with the air conditioning turned on. (Davis Affidavit at 1.) Davis stated that there is a restroom specifically designated for offenders inside of the court building. (Davis Affidavit at 2.) He stated that there is a water fountain just outside of this restroom. (Davis Affidavit at 2.) Davis stated that he did not have authority to remove, adjust or otherwise alter an offender's restraints during or while on a transport. (Davis Affidavit at 2.)

Wood, a Corrections Officer at ROSP, filed an affidavit in support of his Motion for Summary Judgment, (Docket Item No. 27, Exhibit VIII), ("Wood Affidavit"). He stated that he did not recall transporting DePaola to the Wise County Courthouse. (Wood Affidavit at 1.) Wood stated that he did not recall DePaola asking him for water, informing him that he needed to use the restroom or stating that his cuffs were too tight. (Wood Affidavit at 1.) He stated that he would not have left an offender inside of a hot van. (Wood Affidavit at 1.)

## II. Analysis

The defendants have moved for entry of summary judgment in their favor, asserting that there are no genuine issues of material fact on DePaola's claims. With regard to a motion for summary judgment, the standard for review is well-settled. The court should grant summary judgment only when the pleadings, responses to discovery and the record reveal that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). A genuine issue of fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

In considering a motion for summary judgment, the court must view the facts and the reasonable inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *See Anderson*, 477 U.S. at 255; *Matsushita*, 475 U.S. at 587. Thus, the court will view the facts and inferences in

the light most favorable to DePaola on the defendants' Motion. In order to be successful on a motion for summary judgment, a moving party "must show that there is an absence of evidence to support the non-moving party's case" or that "the evidence is so one-sided that one party must prevail as a matter of law." *Lexington-South Elkhorn Water Dist. v. City of Wilmore, Ky.*, 93 F.3d 230, 233 (6th Cir. 1996).

To the extent that DePaola sues the VDOC under § 1983, I find that this is not cognizable because neither a state nor a state agency are persons for purposes of § 1983. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). That being the case, I recommend that the court enter summary judgment in favor of the VDOC on DePaola's § 1983 claims. The defendants also argue that they are immune from suit under § 1983 in their official capacities for monetary damages, as such suits are not cognizable under § 1983. I agree. *See Will*, 491 U.S. at 70-71 (holding that state officials sued in their official capacities are not "persons" within the meaning of § 1983.) Thus, to the extent that DePaola seeks to sue the defendants in their official capacities for monetary damages pursuant to § 1983, I recommend that the court enter summary judgment in the defendants' favor. Furthermore, the Fourth Circuit has held that RLUIPA does not authorize damages against an official in his or her official capacity. *See Madison v. Virginia*, 474 F.3d 118 (4th Cir. 2006). Thus, to the extent that DePaola seeks such a remedy, I recommend that the court enter summary judgment in the defendants' favor.

The defendants also seek summary judgment in their favor on DePaola's claims based on qualified immunity. "Qualified immunity is an affirmative defense that shields public officers performing discretionary duties from 'liability for civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known.'" *Lovelace v. Lee*, 472 F.3d 174, 196 (4th Cir. 2006) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity is "immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Furthermore, qualified immunity may apply to protect officials from civil liability for claims based on violation of constitutional rights or rights under RLUIPA. *See Lovelace,* 472 F.3d at 196-97.

When a government official properly asserts the defense of qualified immunity, he is entitled to summary judgment if either: (1) the facts, taken in the light most favorable to the plaintiff, do not present the elements necessary to state a violation of a constitutional right; or (2) the right was not clearly established such that it would not have been clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *See Pearson v. Callahan,* 555 U.S. 223 (2009).[5] A right is clearly established when a legal question has "been authoritatively decided by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the State . . . ." *Wallace v. King*, 626 F.2d 1157, 1161 (4th Cir. 1980). As long as the conduct's unlawfulness is manifest under existing authority, the exact conduct does not need to be specifically proscribed. *See Wilson v. Layne*, 526 U.S. 603, 614-15 (1999).

---

[5] *Pearson* overruled that part of the Supreme Court's decision in *Saucier v. Katz,* 533 U.S. 194, 205 (2001), which mandated that courts conduct the two-step qualified immunity inquiry in sequential order. *See* 555 U.S. at 234-36. Courts now "have the discretion to decide whether that procedure is worthwhile" and "determine the order of decision making that will best facilitate the fair and efficient disposition of each case." *Pearson,* 555 U.S. at 242. Otherwise, *Saucier* remains as binding precedent.

DePaola claims that Garman violated his First, Fourth, Eighth and Fourteenth Amendment rights by upholding the defendants' actions during the grievance process. However, a superior's after-the-fact denial of a grievance falls far short of establishing § 1983 liability. *See Brooks v. Beard,* 167 F. App'x 923, 925 (3rd Cir. 2006) (allegations that prison officials and administrators responded inappropriately to inmate's later-filed grievances do not establish the involvement of those officials and administrators in the alleged underlying deprivation). Therefore, I recommend that the court enter summary judgment in Garman's favor on DePaola's § 1983 claims against him. I further find that, because DePaola cannot show that Garman's actions amount to a constitutional violation, he also is entitled to qualified immunity on this claim.

DePaola claims that Ray, Rowlette, McCoy, Tate and Gilbert violated his Eighth Amendment rights by placing him in the B-3 pod at ROSP for approximately two and one-half months where offenders were (1) subjected to strip searches in a cage in the pod while female employees watched; (2) denied personal televisions; (3) only allowed to be shaved by an inmate barber once weekly; (4) denied power or cable outlets in their cells, a toilet that the offender could flush himself or a shelf, desk or mirror in the cell; (5) moved from cell to cell periodically; (6) kept behind solid boxed car door cells; and (7) housed under other restrictions not experienced by ROSP segregation offenders not assigned to the B-3 pod.

In *In re Long Term Admin. Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464, 472 (4th Cir. 1999), the Fourth Circuit held that the indefinite duration of an inmate's confinement in segregation does not render it unconstitutional. In that case, inmates complained that they were confined to their

cells for 23 hours per day without radio or television, that they received only five hours of exercise per week and that they were not permitted to participate in prison work, school or study programs. *See In re Long Term Admin. Segregation*, 174 F.3d at 471. The court said that, while these conditions were, indeed, restrictive, the restrictive nature of high-security incarceration, alone, did not constitute cruel and unusual punishment. *See In re Long Term Admin. Segregation*, 174 F.3d at 471 (citing *Sweet v. S.C. Dep't of Corrs.*, 529 F.2d 854, 857 n.1 (4th Cir. 1975)). Thus, I find that the length of DePaola's confinement to the B-3 pod, alone, cannot form the basis for an Eighth Amendment claim.

It is well-settled that "[t]he Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *see Rhodes v. Chapman*, 452 U.S. 337, 349 (1981). The Eighth Amendment's prohibition on cruel and unusual punishment requires that prison officials provide humane conditions of confinement. Prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and … 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer*, 511 U.S. at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)). Conditions of confinement, either alone or in combination, can violate the Constitution when they deprive inmates of "the minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347. However, most prison conditions, even those that are harsh, are simply "part of the penalty that criminal offenders pay for their offenses against society." *Rhodes*, 452 U.S. at 347.

It is well-settled that in order to make out a prima facie case that prison conditions violate the Eighth Amendment, a plaintiff must show both: "(1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison

conditions on the part of prison officials." *Strickler v. Waters*, 989 F.2d 1375, 1379 (4th Cir. 1993) (quoting *Williams v. Griffin*, 952 F.2d 820, 824 (4th Cir. 1991) (citation omitted)). In *Wilson v. Seiter*, 501 U.S. 294, 298 (1991) (internal quotations omitted), the Supreme Court explained that the first prong requires a showing that the deprivation of the basic human need was objectively "sufficiently serious," while the second prong requires a showing that subjectively "the officials act[ed] with a sufficiently culpable state of mind." As to the first prong, the Fourth Circuit has held that "[o]nly extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement." *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003). As to the second prong, the requisite state of mind is one of "deliberate indifference." "[D]eliberate indifference entails something more than mere negligence, … [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 835). Deliberate indifference requires that a prison official know of and disregard the objectively serious condition or deprivation. *See Shakka*, 71 F.3d at 166 (citing *Farmer*, 511 U.S. at 837).

I find that DePaola has failed to present evidence showing that the conditions in the B-3 pod constitute a serious deprivation of a basic human need. As stated herein, only "extreme deprivations" satisfy this objective component of an Eighth Amendment conditions of confinement claim. The Fourth Circuit has defined basic human needs to include things such as food, shelter, and medical care, as well as sanitation, safety, the physical plant, educational, rehabilitation programs, the length of confinement, and out-of-cell time. *In re Long Term Admin. Segregation*, 174 F.3d at 472; *Futrell v. Hardy*, 914 F.2d 248, *2 (4th Cir. Sept. 21, 1990) (citing *Peterkin v. Jeffes*, 855 F.2d 1025 (3d Cir. 1988)).

Furthermore, it is well-settled that, in reviewing complaints of living conditions, the analysis is based on the totality of the circumstances, meaning whether the challenged conditions, alone or in combination, deprive inmates of the minimal civilized measure of life's necessities. *See Williams*, 952 F.2d at 824. The Fourth Circuit has clarified this to mean that the alleged conditions of confinement must have a "mutually enforcing effect that produces the deprivation of a single, identifiable human need . . ." *Wilson*, 501 U.S. at 304. However, "[n]othing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Wilson*, 501 U.S. at 305. For example, a deprivation of blankets combined with low cell temperature might establish an Eighth Amendment violation. *See Wilson*, 501 U.S. at 304.

Here, I find that the B-3 pod conditions of which DePaola complains, either alone or in combination, deprived him of no basic human need, in that he was not denied food, shelter, medical care, safety, educational or rehabilitation programs or out-of-cell time. In *Douglas v. Johnson*, 2013 WL 1123849, at *6 (W.D. Va. Mar. 18, 2013), this court specifically held that an inmate does not have an Eighth Amendment right to a personal television, to shave three times weekly, to be housed in a particular B-3 cell or to be able to flush his own toilet. The *Douglas* court further stated that "[t]he lack of electricity, a shelf, or a desk in a B-3 cell is not a deprivation of a basic human need." 2013 WL 1123849, at *6. While DePaola does complain about sanitation in the B-3 pod, i.e. having to remain in his cell with human waste at times because he did not have the ability to flush his own toilet, I find that this does not rise to the level of a deprivation of a basic human need. More specifically, DePaola claims that, at times, the waste would remain sometimes 30 minutes or longer. He stated that if he used the toilet during the

night, he would have to stay awake until a guard did a cell check[6] or let the waste remain until the morning. However, as the court in *Burgos v. Canino*, 641 F. Supp. 2d 443, 460 (E.D. Pa. 2009), stated, "[t]here is no case precedent awarding a prisoner judicial relief under the Eighth Amendment for having to temporarily endure a bad odor." DePaolo further states that he has been exposed to dirty and sometimes clogged sinks and dirty floors, pillows, mattresses and walls. He claims that he suffered extreme humiliation due to having to sometimes eat and sleep while being exposed to his unflushed waste. He also claims that he suffered from nausea due to the smell of other prisoners smearing their feces/urine while in the B-3 pod. DePaola also alleges that the cells in the B-3 pod were not cleaned between inmate occupancy -- a claim that the defendants deny. DePaola claims that he has suffered psychological trauma due to the conditions he was subjected to while housed in the B-3 pod.

In addition to the requirement of showing the deprivation of a basic human need, in order to withstand summary judgment on an Eighth Amendment challenge to prison conditions, a plaintiff must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions. *See Strickler*, 989 F.2d at 1381. The Eighth Amendment does not prohibit cruel and unusual prison conditions; it prohibits cruel and unusual *punishments*. *See Strickler*, 989 F.2d at 1381. Therefore, if a prisoner has not suffered serious or significant physical or mental injury as a result of the challenged conditions, he simply has not been subjected to cruel and unusual punishment within the meaning of the Amendment. *See Strickler*, 989 F.2d at 1381.

---

[6] DePaola states that prison guards are required to make security checks every 30 minutes, but incidents might arise which prevent that.

Even if the court were to find that DePaola has shown the deprivation of a basic human need, I find that the evidence presented by DePaola does not show a sufficiently serious or significant injury as a result thereof. Simply alleging humiliation, nausea and psychological trauma, without more, as DePaola has done here, is insufficient to withstand the defendants' Motion on this claim. Therefore, I recommend that the court grant the defendants' Motion on DePaola's § 1983 claim alleging an Eighth Amendment violation based on the conditions in the B-3 pod. Given this finding, I further recommend that the court find that the defendants are entitled to qualified immunity on this claim, as well.

Next, DePaola alleges that Ray, Rowlette, McCoy, Tate and Gilbert violated his Fourth Amendment rights by requiring him to submit to strip searches while in the B-3 pod. The Fourth Amendment protects against unreasonable searches and seizures. *See* U.S. CONST. amend. IV. While prisoners maintain Fourth Amendment protection, they have much more limited privacy interests than individuals not incarcerated. *See Bell v. Wolfish*, 441 U.S. 520, 545-46 (1979); *Lee v. Downs*, 641 F.2d 1117, 1119 (4th Cir. 1981). A prison regulation or policy that impinges on an inmate's Fourth Amendment right "is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987); *see also Bell*, 441 U.S. at 545-46. In making such a determination, the court must consider "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell*, 441 U.S. at 559. Moreover, the Supreme Court has long cautioned that "[c]ourts are ill equipped to deal with the increasingly urgent problems of prison administration[,]" *Procunier v. Martinez*, 416 U.S. 396, 405 (1974) (dictum), and, thus, the court "must accord deference to the officials who run a prison, overseeing and coordinating its many aspects, including security, discipline, and general

administration." *Lovelace*, 472 F.3d at 199. In other words, the court must "respect the determinations of prison officials." *United States v. Stotts*, 925 F.2d 83, 86 (4th Cir. 1991).

De Paolo alleges that Ray, Rowlette, McCoy, Tate and Gilbert violated his Fourth Amendment rights by conducting strip searches in the B-3 pod every time an offender exits or returns to a pod cell. The strip search protocol in the B-3 pod requires an offender to remove all clothing. A visual examination is conducted of the offender's head, hair, mouth, torso, pelvic area, legs and feet. The offender is instructed to spread his buttocks, squat and cough and raise his arms, penis and scrotum during the visual inspection. This strip search all takes place in a strip search cage outside of the offender's cell. When the visual inspection concludes, the clothes are returned, and the offender redresses. (Tate Affidavit at 2). The only difference in the strip search protocol for the B-3 pod and that for inmates housed in regular administrative segregation is the strip searches in administrative segregation are conducted inside of the offender's cell. According to DePaola, these strip searches occur every time an inmate leaves his B-3 pod cell and again upon reentry.

Ray stated in his affidavit that the B-3 pod was developed to make ROSP a safer environment for staff and offenders. (Ray Affidavit at 1-2.) It was developed with certain security enhancements, including the performance of strip searches outside of the cell with the offender in a strip search cage, which allowed the officers to fully view the offender. (Ray Affidavit at 2.) Likewise, Rowlette stated that the B-3 pod was created to make ROSP a safer environment for staff and offenders. (Rowlette Affidavit at 1.) McCoy stated that the B-3 pod was created to make sure offenders were managed and that everyone at ROSP,

including staff, was in a safe and healthy living environment. (McCoy Affidavit at 1.) Tate stated that offenders were moved to the B-3 pod for a number of security reasons. (Tate Affidavit at 1.)

Strip searches have been held constitutional in certain circumstances. *See Bell*, 441 U.S. at 558. The *Bell* Court held that the following factors must be balanced in determining the constitutionality of a strip search: the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it and the place in which it is conducted. *See* 441 U.S. at 559. In the case before the court, I find that the scope of the challenged prison policy is limited, as these strip searches are performed on inmates confined in the B-3 pod, which is the most restrictive housing unit at ROSP, a supermax facility. The B-3 pod is reserved for those inmates who cannot comply with the rules in the regular administrative segregation housing units at ROSP. Additionally, I find that the manner in which the searches are conducted creates limits on the degree of intrusiveness. More specifically, the searches are visual and involve no touching. *See Bonitz v. Fair*, 804 F.2d 164, 172-73 (1st Cir. 1986) (overruled on other grounds) (discussing differences between visual searches and searches involving touching).

Furthermore, in *Hudson*, 468 U.S. at 526-27, the Supreme Court acknowledged that maintaining prison safety and preventing the introduction of contraband into the prison are important objectives of penal institutions. Ray, Rowlette and McCoy have provided affidavit testimony that the enhanced security measures of the B-3 pod, including the strip search protocol described above, were created to make ROSP a safer environment for staff and offenders. In *Goff v. Nix*, 803 F.2d 358 (8th Cir. 1986), the Eighth Circuit observed that security

considerations justified such searches of inmates in segregation units. The *Goff* Court noted that it had been long acknowledged that weapons, drugs and other items of contraband are serious problems in prisons. *See* 803 F.2d at 364. The *Goff* Court further observed that such security concerns were even greater in segregation units which house inmates who have demonstrated an inability to conform to prison rules. *See* 803 F.2d at 365. I find that the same can be said in the instant case. ROSP is a supermax prison. All inmates incarcerated there are, at the very least, housed in administrative segregation. The B-3 pod was created to handle those inmates who cannot comply with the restrictive nature of regular administrative segregation. The B-3 pod also has been called "superseg," denoting the nature of the restrictions imposed, as well as the type of inmates housed there.

I next find that the strip searches were conducted in a reasonable place, given the nature of the inmates assigned to the B-3 pod. The strip searches were conducted in a cage outside of the offender's cell because this allowed the officers a full view of the offender's body. According to Ray, strip searches conducted inside of an offender's cell did not allow officers a full view of an offender's body due to the solid cell door with its slender window. Given the nature of the offender housed in the B-3 pod and, therefore, the increased security demands, I find it reasonable to conduct the search in the cage outside of the cell which allows a full body view.

It is for all of these above-stated reasons that I find that a reasonable jury could not find that the strip searches, as conducted in the B-3 pod, do not serve a legitimate penological interest. That being the case, I further find that there is no genuine issue of material fact on this issue. I find that the strip search protocol, as conducted in the B-3 pod, does not violate DePaola's Fourth Amendment rights,

and  I recommend that the court grant the defendants' Motion on this claim.  Thus, I further find that the defendants are entitled to qualified immunity on this claim.

DePaola also contends that his Fourth Amendment rights were violated because the strip cage was positioned in a manner so that female prison employees could view the offender during these strip searches.  He does not allege that any female guards ever actually conducted the strip searches or intentionally stood by for the purpose of observing a strip search.  Instead, he claims that he was subjected to strip searches as female employees "would be walking past able to view said search and [his] nakedness due to said … cage being only approx. 3x3 feet … and completely open styled caging (except for one side of said cage which was blacked out from waste (sic) down (approx.)"  (Complaint at 12).

The Fourth Circuit has held that undressed inmates are not to be viewed by prison staff of the opposite sex when not reasonably necessary.  *See Lee*, 641 F.2d at 1120-21 (finding "reasonably necessary" to include responding to an exigent circumstance, like male officers extinguishing a fire in a naked woman's cell).  Even "male prisoners are … entitled to judicial protection of their right of privacy denied by the presence of female guards stationed in positions to observe the men while undressed or using toilets."  *Lee*, 641 F.2d at 1120; *see also Canedy v. Boardman*, 16 F.3d 183, 187 (7th Cir. 1994) (cross-gender strip searches of inmates or regular exposure of nude inmates to guards of opposite sex violates inmates' privacy rights).

Just as in *Douglas*, 2013 WL 1123849, nothing in the record here clarifies why any females were present in the B-3 pod while these strip searches were being conducted or whether their presence was a routine or an isolated event.  *See Timm*

*v. Gunter*, 917 F.2d 1093 (8th Cir. 1990) (distinguishing between minimal and constant, intrusive cross-gender observation). As DePaola does not allege that any female ever conducted a strip search or stood by and observed one being performed, it is obvious that male staff also were present in the B-3 pod at the time these strip searches were conducted. This could indicate that male staff were present without a reasonable need for female staff to be viewing DePaola's routine strip searches. Viewing the facts in the light most favorably to DePaola, as the court must, I find that there is a genuine issue of material fact in dispute as to whether any of the female staff saw DePaola's strip searches without reasonable necessity. *See Jonathan Lee X v. Bratten*, 1994 WL 410888, at *3 (4th Cir. Aug. 8 1994) (finding plaintiff's allegation that a female officer watched his strip search is a matter within his personal knowledge and is sufficient to state a claim for relief). However, DePaola must relate the female staff's observations to some personal act or omission by the defendants.

DePaola argues that Ray, Rowlette, McCoy and Tate ordered and approved the strip search protocol in the B-3 pod. It is clear that a supervisor may be liable for a constitutional deprivation "where it is affirmatively shown that the official charged acted personally in the deprivation of the plaintiffs' rights," *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977), or a subordinate acted pursuant to official policy or custom to cause the deprivation. *See Shaw v. Stroud*, 13 F.3d 791 (4th Cir. 1994). In order to hold a supervisor liable for a subordinate's act, a plaintiff must show that: (1) the supervisor had actual or constructive knowledge that a subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to people like the plaintiff; (2) the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices"; and (3) that there was

an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *Shaw*, 13 F.3d at 799; *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 663 n.7 (1978) (holding supervisory liability under § 1983 may not be predicated on the theory of respondeat superior).

Here, DePaola claims that Tate, whom he alleges ordered and approved the strip search policy and was the building supervisor, actually performed at least one of these strip searches on February 7, 2011, the day he was assigned to the B-3 pod. DePaola also alleges that Gilbert and Collins performed a strip search prior to and/or subsequent to transporting him to a court hearing on March 22, 2011. DePaola alleges that Gilbert, a Sergeant of the B-3 pod, had supervisory abilities over all aspects of the B-3 pod. Having alleged that Tate and Gilbert personally performed some of these strip searches, and having found herein that there is a genuine issue of material fact in dispute as to whether any of the female staff saw DePaola's strip searches without reasonable necessity, I find that there also is a genuine issue of material fact in dispute as to whether Tate and Gilbert may be held liable under a theory of supervisory liability for the same. Therefore, I recommend that the court deny Tate's and Gilbert's Motions on DePaola's § 1983 claim alleging a violation of the Fourth Amendment because females were able to view the strip searches performed in the strip search cage. That being the case, I further find that Tate and Gilbert are not entitled to qualified immunity on this claim at this time.

As for Ray, Rowlette and McCoy, DePaola must show that a subordinate acted pursuant to official policy or custom to cause a constitutional deprivation.[7] To do this, DePaola must first show the supervisor (1) had knowledge of (2) conduct engaged in by a subordinate (3) where the conduct poses a pervasive and unreasonable risk of constitutional injury to the plaintiff. *See Slakan v. Porter*, 737 F.2d 368, 373 (4th Cir. 1984). Establishing a "pervasive" and "unreasonable" risk of harm requires evidence that the conduct is widespread or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury.

Here, I find that DePaola specifically describes no policy or practice of allowing females to watch strip searches in the B-3 pod. He also does not allege that female staff observed his strip searches pursuant to Ray, Rowlette or McCoy's policy or practice. DePaola contends that the strip search protocol was ordered to be performed and was approved by Ray, Rowlette, McCoy and Tate. McCoy stated in his affidavit that he did not create or implement any new policy that allowed for strip searches of offenders. (McCoy Affidavit at 2.) Likewise, by affidavit, Rowlette stated that he did not create or implement any new policy that allowed for strip searches of offenders. (Rowlette Affidavit at 2.) Tate also testified by affidavit that he also was not responsible for implementing or creating any policy or procedure concerning the strip search protocol as DePaola alleges. (Tate Affidavit at 2.) Moreover, DePaola does not allege that Ray, Rowlette or Tate had any knowledge that any female staff ever watched his strip searches or that male staff permitted the same to occur. DePaola does not allege that Ray's or

---

[7] While Tate and Gilbert may be found liable under this theory as well, given the earlier recommendation based on their personal involvement in DePaola's strip searches, I will focus only on Ray, Rowlette and McCoy.

Rowlette's policy or practice either required or encouraged female staff to watch strip searches in the B-3 pod. Lastly, I find that DePaola does not adequately allege that Ray, Rowlette or McCoy personally deprived him of any constitutional right. For these reasons, I find that defendants Ray, Rowlette and McCoy are entitled to summary judgment on DePaola's § 1983 claim alleging a Fourth Amendment violation because female staff could view the strip searches in the strip search cage. That being the case, I further find that these defendants are entitled to qualified immunity on this claim.

A correctional officer may be held liable on a theory of bystander liability if the officer: "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Randall v. Prince George's County, Md.*, 302 F.3d 188, 204 (4th Cir. 2002); *see Willis v. Oakes*, 493 F. Supp. 2d 776, 784 (W.D. Va. 2007) (noting a plaintiff must prove a violation of a constitutional right as a prerequisite to establishing bystander liability). Viewing the facts, and the reasonable inferences therefrom, in the light most favorable to DePaola, Collins would have been aware that female staff were present in the B-3 pod and observing plaintiff's strip searches on various occasions, in violation of the Fourth Amendment, and he could reasonably have prevented the harm by delaying the strip search until female staff had left the area or moved to the side of the cage that is blacked out from the waist down. *See Randall*, 302 F.3d at 204 n.23 (recognizing bystander liability is not limited to excessive force claims). Based on the liberal construction and perspectives accorded to DePaola, and the current absence of a reasonable necessity for the presence of female staff, I find that DePaola's claim of bystander liability against Collins is sufficient to withstand Collins's Motion, and I

recommend that the court so find.  Thus, I further find that Collins is not entitled to qualified immunity on this claim at this time.

DePaola next argues that defendants Ray, Rowlette, McCoy and Tate violated his Fourteenth Amendment due process rights by assigning him to the B-3 pod without a hearing.  For the following reasons, I find that the defendants are entitled to summary judgment on this claim.  In order to establish a due process violation under the Fourteenth Amendment, an inmate must prove that prison officials deprived him of a legitimate liberty or property interest.  *See Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 569-70 (1972); *see also Beverati v. Smith*, 120 F.3d 500, 502 (4th Cir. 1997).  Thus, the court must first determine whether the alleged deprivation impacts such a protected interest.  *See Beverati*, 120 F.3d at 502; *Mallette v. Arlington County Employees' Supplemental Retirement Sys. II*, 91 F.3d 630, 634 (4th Cir. 1996).

When a defendant is lawfully convicted and confined to prison, he loses a significant interest in his liberty for the period of the sentence.  *See Gaston v. Taylor*, 946 F.2d 340, 343 (4th Cir. 1991).  However, state prison regulations may create liberty interests, which are limited to "freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, … nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  *Sandin v. Conner*, 515 U.S. 472, 484 (1995) (internal citations omitted).

It is well-settled that inmates have no protected liberty interest in being housed in any particular prison or housing unit with less restrictive conditions.  *See*

*Meachum v. Fano*, 427 U.S. 215, 224-25 (1976) ("The conviction has sufficiently extinguished the defendant's liberty interest to empower the State to confine him in *any* of its prisons") (emphasis in original); *Montanye v. Haymes*, 427 U.S. 236, 242-43 (1976) (holding that a mere transfer from one facility to another does not implicate the Due Process Clause, regardless of whether the transfer is the result of the inmate's misbehavior or is punitive in nature); *Kennedy v. Blankenship*, 100 F.3d 640, 642, 643 n.2 (8th Cir. 1996) (holding that placement in punitive isolation was not atypical and significant deprivation even though prisoner faced restrictions in mail, telephone, visitation, commissary and personal-possession privileges). "[A]n inmate does not have a constitutional right to be placed in a specific security classification or facility, and custodial classifications do not create a major disruption in a prisoner's environment." *Williams v. Johnson*, 2010 WL 3395700, at *2 (W.D. Va. Aug. 26, 2010) (citing *Sandin*, 515 U.S. at 486-87). Changes "in a prisoner's location, variations of daily routine, changes in conditions of confinement (including administrative segregation), and the denial of privileges [are] matters which every prisoner can anticipate [and which] are contemplated by his original sentence to prison." *Gaston*, 946 F.2d at 343.

I find that DePaola has failed to show that he has a protected liberty interest related to his B-3 segregated status at ROSP. More specifically, I find that DePaola has failed to show that the conditions in the B-3 pod imposed atypical and significant hardship on him when compared to the conditions imposed upon the inmates in regular administrative segregation at ROSP or those in relation to ordinary incidents of prison life. DePaola describes the following conditions in the B-3 pod: the cells have no table, shelf, mirror or power/cable outlet; inmates are not allowed personal televisions or headphones, but must watch television that is projected onto a wall in the pod; the toilets in the cells must be flushed by guards

from outside of the cell; the outside windows in the cells are covered by a steel grate, restricting the amount of sunlight in the cell; the cell door windows have a steel flap shutter which is closed any time there is prisoner movement within the B-3 pod; inmates are typically moved from cell to cell to hinder communication among the inmates; cells are not cleaned and/or sanitized prior to inmate placement; inmates are strip searched every time they leave their cells -- once inside the cell, and again in the strip search cage; before reentering their cells, B-3 inmates are again strip searched in the strip search cage; only up to three inmates are allowed in the recreation yard at any given time, each placed in 5x9 foot cages spaced apart so that no physical contact may be had among them; and inmates have only one opportunity weekly to be shaved by an inmate barber.

DePaola alleges that, as a result of the cells not being cleaned or sanitized between inmate occupancy, he was exposed to soiled toilets, dirty and sometimes clogged sinks and dirty floors, mattresses and walls. As regards the projected television, DePaola alleges that it was often blocked by the shutter on the cell door, and when these shutters were open, the picture was distorted by pod lights shining in front of it. DePaola further alleges that this television also was muted, and the channels which had closed captioning could not be read due to the pod lights, except after 10:00 p.m. when the lights were turned off. Additionally, DePaola contends Tate implemented that policy of only allowing the pod television to broadcast educational or religious programs from 6:00 a.m. to 6:00 p.m. Monday through Friday. However, because these programs did not have closed captioning, inmates in the B-3 pod were effectively provided no educational or religious programming during those times. DePaola alleges that inmates in regular administrative segregation were able to view cable television channels all day every day. DePaola also contends that other prisoners housed in B-3 often beat

and banged on cell doors and walls and screamed and yelled through their cell doors at all times during the day and night. Additionally, prisoners smeared feces and urine on cell walls, floors and in the strip search cage.

In his affidavit, Rowlette stated that offenders in the B-3 pod retained access to showers and recreation as frequently as other segregation offenders. (Rowlette Affidavit at 1.) Likewise, McCoy stated that the offenders in the B-3 pod received the same recreation, showers, medical treatment and attorney access as other segregation offenders. (McCoy Affidavit at 1-2.)

In *Beverati*, 120 F.3d at 504, the Fourth Circuit found that even if inmates placed in administrative segregation found their cells infested with vermin, smeared with human feces and urine, flooded with water, and unbearably hot, received food cold and in small portions, infrequently received clean clothing, linen and bedding, were only permitted to leave their cells three to four times per week and were denied outside recreation, educational or religious services, these conditions in administrative segregation were not so atypical that exposure to them for six months imposed a significant hardship in relation to the ordinary incidents of prison life, as required to support a claim that segregation violated the inmates' procedural and substantive due process rights.

I find that, while the conditions in the B-3 pod, as described by DePaolo, are "more onerous" than those conditions imposed upon inmates housed in regular administrative segregation at ROSP, they are not nearly as harsh as those described in *Beverati* which the Fourth Circuit found did not constitute the requisite significant and atypical hardship to support a due process claim. That being the case, I find that DePaola has failed to show that he had any liberty interest in

avoiding confinement in the B-3 pod, and I recommend that the court grant summary judgment in the defendants' favor on DePaola's § 1983 claim alleging that the defendants violated his Fourteenth Amendment due process rights. Thus, I further find that the defendants are entitled to qualified immunity on this claim.

Next, DePaola argues that Ray, Rowlette, McCoy, Tate and the VDOC[8] violated his First Amendment rights, as well as his rights under RLUIPA, when he could not hear the Jumu'ah services, as they were shown on the muted B-3 pod projected television. He also argues that Phipps, Hartsock, Wood and Davis violated these same rights because he could not perform wudu and pray according to his religious beliefs when he was restrained in a transport van while awaiting a court hearing.

Courts have held that although inmates lose some constitutional protections upon incarceration, they retain the right to freely worship while in prison. *See McManus v. Bass*, 2006 WL 753017, at *4 (E.D. Va. Mar. 22, 2006) (citing *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987); *Bell*, 441 U.S. at 545)). The Free Exercise Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. …" U.S. CONST. amend. 1. The Free Exercise Clause extends to prison inmates. *See O'Lone*, 482 U.S. at 348; *Morrison v. Garraghty*, 239 F.3d 648, 656 (4th Cir. 2001). However, an inmate's religious rights must be evaluated within the context of his incarceration. As stated above, the Supreme Court has long cautioned that "courts are ill equipped to deal with the increasingly urgent problems of prison administration[,]" *Procunier*, 416 U.S. at 405, and, therefore, the court "must accord deference to the officials who run a prison, overseeing and

---

[8] The undersigned has recommended dismissing the VDOC as a defendant in this action.

coordinating its many aspects, including security, discipline, and general administration[,] *Lovelace*, 472 F.3d at 199. This deference is achieved by a rational basis test, under which the court considers four factors to determine if prison regulations are reasonably related to legitimate penological interests: (1) whether there is a "valid, rational connection" between the prison regulation or action and the interest asserted by the government, or whether the interest is "so remote as to render the policy arbitrary or irrational;" (2) whether there are alternative means of exercising the asserted constitutional right that remain open to inmates; (3) what impact the desired accommodation would have on security, staff, inmates and the allocation of limited prison resources; and (4) whether there exist any "obvious, easy alternatives" to the challenged regulation or action, which may suggest that it is "not reasonable, but is [instead] an exaggerated response to prison concerns." *Lovelace*, 472 F.3d at 200 (quoting *Turner*, 482 U.S. at 89-92). When applying these factors, the court must "respect the determinations of prison officials." *Stotts*, 925 F.2d at 86. The burden of proof under the *Turner* analysis is on the prisoner to disprove the validity of the prison regulation at issue. *See Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).

In order to establish a right under the Free Exercise Clause, DePaola must make two threshold showings before turning to the rational basis test. First, he must show that he sincerely holds his religious beliefs. *See Wisconsin v. Yoder*, 406 U.S. 205, 214-16 (1972). Second, DePaola must show that his claims are rooted in religious belief and are not "purely secular." *Yoder*, 406 U.S. at 215. If DePaola can make these two threshold showings, he then must show that the free exercise of his religion is substantially burdened by the government policy or action at issue. *See Sherbert v. Verner*, 374 U.S. 398 (1963).

RLUIPA requires a "more searching standard of review … than the standard used in parallel constitutional claims: strict scrutiny instead of reasonableness." *Lovelace*, 472 F.3d at 186 (internal quotations omitted). Section 3 of RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution … unless the government demonstrates that imposition of the burden … (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C.A. § 2000cc-1(a) (West 2012). The term "government" as used in § 2000cc-1 is defined broadly to include: "(i) a State, county, municipality, or other governmental entity created under the authority of a State; (ii) any branch, department, agency, instrumentality, or official of an entity listed in clause (i); and (iii) any other person acting under color of State law[.]" 42 U.S.C.A. § 2000cc-5(4)(A) (West 2012). RLUIPA defines religious exercise as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C.A. § 2000cc-5(7)(A) (West 2012). "If a plaintiff produces prima facie evidence" of a RLUIPA violation, "the government shall bear the burden of persuasion on any element of the claim, except that the plaintiff shall bear the burden of persuasion on whether the law (including a regulation) or government practice that is challenged by the claim substantially burdens the plaintiff's exercise of religion." 42 U.S.C.A. § 2000cc-2(b) (West 2012). "As to those elements on which it bears the burden of proof, a government is only entitled to summary judgment if the proffered evidence is such that a rational factfinder could only find for the government." *Smith v. Ozmint*, 578 F.3d 246, 250 (4th Cir. 2009) (citing *Gooden v. Howard County, Md.*, 954 F.2d 960, 971 (4th Cir. 1992)) ("[W]here … the movant would have the burden of persuasion at trial, the summary judgment burden is correspondingly a heavy one.").

As under the First Amendment, although prison officials may not question the truth of an inmate's belief, an inmate must demonstrate that the belief is sincerely held in order to establish a protected right under RLUIPA. *See McManus*, 2006 WL 753017, at *5 (citing *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005)). Under both the First Amendment and RLUIPA, DePaola also must show that his right to the free exercise of his religion has been "substantially burdened." *McManus*, 2006 WL 753017, at *5 (quoting *Hernandez v. Comm'r of Internal Revenue*, 490 U.S. 680, 699 (1989); *see also* 42 U.S.C. § 2000cc(a). RLUIPA does not define "substantial burden." However, the Fourth Circuit has held that a "substantial burden" on religious exercise occurs when a state or local government, through act or omission, puts substantial pressure on an adherent to modify his behavior and to violate his beliefs or one that forces a person to choose between following the precepts of his religion and forfeiting governmental benefits on the one hand, and abandoning one of the precepts of his religion on the other hand. *See Lovelace*, 472 F.3d at 187 (internal quotation omitted). The Fourth Circuit in *Lovelace* further held that in assessing whether a substantial burden on religious exercise exists for purposes of RLUIPA, courts must not judge the significance of the particular belief or practice in question. *See* 472 F.3d at 187 n.2.

DePaola alleges that he has been a practicing Muslim for more than five years and that his religion requires him to observe Jumu'ah services every Friday. He further alleges that because ROSP is a supermax facility, administrative segregation inmates are not allowed to physically attend Jumu'ah services in a group setting. Instead, in the B-3 pod, Jumu'ah services are shown by prison officials on the pod television, which is projected onto a wall, by DVD on Fridays.

DePaola alleges that he was unable to meaningfully watch the Jumu'ah services in the B-3 pod because the television was muted, and no closed captioning was available for these DVDs. DePaola further alleges that, due to the pod lights shining on the projected image, the picture was distorted, thereby preventing him from meaningfully viewing these services, as well.

The defendants do not contest DePaola's assertion that he is a practicing Muslim who must observe Jumu'ah every Friday, and there is nothing in the record before the court to suggest that DePaola does not sincerely hold this religious belief. That being the case, I find that DePaola has presented sufficient evidence that he does, in fact, sincerely hold this belief. I also find that DePaola has presented sufficient evidence that watching the DVD recordings of Jumu'ah services by way of the muted television with no closed captioning and distorted images placed a substantial burden on the exercise of his religion because he effectively was prevented from practicing an obligatory tenet of his religion. The only "choice" DePaola had was to attempt to watch these muted DVDs without closed captioning and with distorted pictures or not watch Jumu'ah services at all. Having made these two findings, under the RLUIPA analysis, the burden shifts to the defendants to present evidence that the practice of showing Jumu'ah services by DVD on a muted television with no closed captioning and with a distorted picture furthers a compelling governmental interest and is the least restrictive means of furthering that interest.

Courts should apply this compelling governmental interest standard with "due deference to the experiences and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources…. Of

these enumerated concerns, security deserves 'particular sensitivity.'" *Lovelace*, 472 F.3d at 190 (quoting *Cutter*, 544 U.S. at 722-23). "In this regard, 'RLUIPA [is not meant] to elevate accommodation of religious observances over an institution's need to maintain order and safety.'" *Couch v. Jabe*, 679 F.3d 197, 201 (4ᵗʰ Cir. 2012) (quoting *Cutter*, 544 U.S. at 722). "[A] court should not rubber stamp or mechanically accept the judgments of prison administrators." *Couch*, 679 F.3d at 201 (quoting *Lovelace*, 472 F.3d at 190). Instead, "due deference will be afforded to those explanations that sufficiently 'take[] into account any institutional need to maintain good order, security, and discipline.'" *Couch*, 679 F.3d at 201 (quoting *Lovelace*, 472 F.3d at 190). The "burden of justifying a policy in terms of security concerns is an 'unremarkable step.'" *Couch*, 679 F.3d at 201 (quoting *Lovelace*, 472 F.3d at 190). However, a bare assertion that a policy is for security reasons, does not, by itself, explain why the security interest is compelling. *See Smith*, 578 F.3d at 252.

While the defendants have submitted affidavits from various defendants in connection with the Motion, the only affidavits which address the Jumu'ah services or the B-3 pod television in any way are those of Ray and Tate. In his affidavit, Ray states that B-3 pod inmates are allowed to watch Jumu'ah services on the pod television, which is a projector television without sound and with closed captioning. (Ray Affidavit at 3). However, Ray states that because Jumu'ah services are on DVD, closed captioning is not available. (Ray Affidavit at 3). He states that this, however, did not prevent DePaola from practicing his faith in other ways, including reading his religious materials, speaking with the facility Chaplain, participating in a common fare diet, if applicable, and praying. (Ray Affidavit at 3). Tate stated in his affidavit that, contrary to DePaola's allegation, he did not order religious and educational only programming be placed on the pod television.

(Tate Affidavit at 2). He stated that religious and educational programming is available on the pod television from 6:00 a.m. to 6:00 p.m., after which time standard cable programming is available. (Tate Affidavit at 2). Tate stated that he did not decide which programming was offered to the offenders. (Tate Affidavit at 2).

Thus, the defendants, in their affidavits, offer no explanation as to why the Friday Jumu'ah services are offered by DVD with no sound and without closed captioning with the pod lights on, thereby interfering with the projected images. The defendants' brief is, likewise, silent as to any explanation for such practice. Having offered *no* explanation, I cannot find that the defendants have offered a compelling governmental interest for the practice. That being the case, I recommend that the court deny summary judgment on DePaola's RLUIPA claim related to Friday Jumu'ah services. Thus, I further find that the defendants are not entitled to qualified immunity on this claim at this time.

The court next considers DePaola's claim that the Friday Jumu'ah service practice violates his First Amendment rights under the Free Exercise Clause. Applying *Turner's* rational basis factors, I find, for the same reasons stated above, that the defendants are not entitled to summary judgment. The first *Turner* factor weighs in favor of DePaola because the defendants simply have offered no governmental interest, and the court is hard-pressed to easily identify a valid, rational connection between the practice of showing Jumu'ah services on a muted television without closed captioning and with distorted images due to a light shining on the wall. The second factor weighs in favor of the defendants because Ray's affidavit states that DePaola could practice his religion in other ways, such as by reading religious materials, speaking with the facility Chaplain, participating

in the common fare diet, if applicable, and praying. Thus, there are alternative means of exercising his religion available to him. *See O'Lone*, 482 U.S. at 351-52 (holding the relevant inquiry for this factor is whether inmates have been denied *all* means of religious expression, not for the particular religious practice allegedly violated). With regard to the third factor, DePaola suggests that the defendants provide the Jumu'ah services on DVDs with closed captioning. For whatever reason, the defendants have not addressed this suggestion in their brief. Accordingly, they have not stated that such a practice would be impracticable or impossible. The court has no evidence before it that providing such DVDs with closed captioning would have a negative impact on prison staff, on inmates' liberty or on the allocation of limited prison resources. Therefore, I find that the third factor weighs in favor of DePaola. Lastly, DePaola has suggested the alternative of providing DVDs with closed captioning. As just stated, however, the defendants have not addressed this suggestion, and the court has no evidence before it to suggest that this would not constitute an "obvious, easy alternative." Having found that three of the four *Turner* factors weigh in favor of DePaola, I recommend that the court deny the defendants' Motion on DePaola's § 1983 claim alleging a First Amendment violation related to the Friday Jumu'ah services. That being said, I further find that the defendants are not entitled to qualified immunity on this claim at this time.

DePaola also raises First Amendment and RLUIPA claims against Phipps, Hartsock, Wood and Davis based on his inability to perform obligatory daily prayers during transport to and while awaiting a court hearing on March 22, 2011. More specifically, DePaola contends that this transport lasted approximately 7.5 hours, during which time he was not allowed to perform "wudu," a mandatory practice performed to physically cleanse the body before praying in the Islamic

faith. DePaola stated that he is required to pray at least five times per day, but due to the conditions during the transportation, he was unable to pray at two of these prayer times. The evidence before the court shows that Davis and Wood drove the transport van, while Hartsock and Phipps followed behind in another vehicle.

For the same reasons stated above, I find that DePaola has sincerely held religious beliefs that he must perform "wudu" and that he must pray at least five times daily. The defendants do not deny that DePaola was not able to perform wudu and, therefore, unable to perform mandatory prayers while he was restrained in the prison transport van awaiting his court hearing. I also find that DePaola's exercise of his religion was substantially burdened, as he was physically restrained from performing the above-mentioned mandates of his religion. He simply had no choice as to whether he would perform wudu or the obligatory prayers. Having made the requisite showing of a substantial burden, the burden shifts to the defendants to show that the method of restraint which prevented him from doing so furthered a compelling governmental interest.

In his affidavit, Hartsock stated that prior to the March 22, 2011, transport to the Wise County Courthouse, DePaola was taken to the intake receiving area, where he was placed in standard restraints in preparation for the transport, including handcuffs, waist chains, leg irons and a security box. (Hartsock Affidavit at 1). In their brief, the defendants argue that Phipps, Hartsock, Wood and Davis had to ensure that DePaola remained securely restrained while he was away from the prison facility. They state in their brief that public safety is the mission of the VDOC, and as part of carrying out this mission, the VDOC officials must keep offenders properly and securely confined or restrained at all times.

As stated above, the Fourth Circuit in *Couch* and *Smith* held that blanket statements regarding security are insufficient to make the necessary showing of a compelling governmental interest to support a RLUIPA claim. In *Couch*, the Fourth Circuit found that the defendants must connect the policy restrictions at issue to the specific concerns, and show that these concerns are furthered by the policy. *See* 679 F.3d at 202. Likewise, in *Smith*, the Fourth Circuit held that "conclusory, one-sentence explanation[s] do[] not, by [themselves], explain why the security interest is compelling." 578 F.3d at 252 (citing *Lovelace*, 472 F.3d at 190). "Rather, prison officials must supply adequate record evidence that the particular security concerns that prompted the policy are compelling and are advanced by their policy." *Lee v. Gurney*, 2009 WL 3109850, at *6 (E.D. Va. Sept. 25, 2009) (citing *Smith*, 2009 WL 2366134, at *5; *Lovelace*, 472 F.3d at 190-91).

Here, the defendants have made nothing more than the type of conclusory statements regarding security, which were deemed insufficient in *Couch* and *Smith*. None of the defendants addressed this particular issue in their affidavits. The only mention of this issue is contained in the defendants' brief, which states as follows: "Public safety is the mission of the VDOC. As a part of carrying out this mission, VDOC officials must keep offenders properly and securely confined or restrained at all times. … Phipps, Hartsock, Wood, and Davis had to ensure that DePaola remained securely restrained while he was away from the prison facility." (Docket Item No. 27, ("Brief"), at 16.) For these reasons, I find that the defendants have failed to make the necessary showing of a compelling governmental interest. Therefore, I recommend that the court deny the defendants' Motion related to DePaola's RLUIPA claim on his inability to perform wudu and the obligatory

prayers during the March 22, 2011, transport. Thus, I further find that the defendants are not entitled to qualified immunity on this claim at this time.

The court next considers DePaola's claim that this restraint method violates his First Amendment rights under the Free Exercise Clause. Applying *Turner's* rational basis factors, I first find that there is an obvious "valid, rational connection" between keeping inmates properly restrained while off prison grounds and security. It is clear that inmates who are not properly restrained pose the real threat of escaping from custody, overtaking guards, including their weapons, harming members of the general public, and generally terrorizing the community. Thus, this factor decidedly weighs in favor of the defendants. Next, alternative means of exercising religious rights remain open to DePaola. I first note that DePaola claims that he missed only two of the mandatory prayer times during the transport, so he still was able to pray three times in the manner mandated by his religion on March 22, 2011. Also, he may pray at times other than those mandated by his religion. Additionally, as Ray states in his affidavit, ROSP inmates are allowed to read religious materials, speak with the facility Chaplain, participate in the common fare diet, if applicable, and view Jumu'ah services on televisions in their cells.[9] Thus, I find that this factor militates in favor of the defendants. Neither the defendants nor DePaola have proffered any argument regarding the third factor – to what extent accommodation of the asserted right would impact prison staff, inmates' liberty and the allocation of limited prison resources. Accommodating DePaola's rights to perform wudu and pray during transport and while awaiting a court hearing, would ostensibly require DePaola to *not be*

---

[9] I include this as an alternative means of practicing religion because DePaola does not challenge the Jumu'ah services the inmates in regular administrative segregation are allowed to watch on their personal televisions.

*securely restrained* while off of prison grounds.  If this is the case, then all the reasons just stated in relation to the first factor are relevant here, as well.  Thus, this factor also weighs in favor of the defendants.  DePaola has presented no evidence of "obvious, easy alternatives" to the restraint method described above, suggesting that it may not be reasonable, and the court cannot imagine such a scenario.  Thus, I find that this factor weighs in favor of the defendants, as well.

Because all of the four *Turner* factors weigh in favor of the defendants, because the plaintiff bears the burden of disproving the policy at issue, and because the court must "respect the determinations of prison officials," *see Stotts*, 925 F.2d at 86, I find that the defendants have shown that the restraint method at issue serves a legitimate penological interest.  That being the case, I recommend that the court grant the defendants' Motion on DePaola's § 1983 claim alleging a First Amendment violation based on his inability to perform wudu and obligatory prayers while restrained in a transport van on March 22, 2011.  Thus, I further find that the defendants also are entitled to qualified immunity on this claim.

Next, DePaola claims that Collins, Phipps, Hartsock, Wood and Davis violated his Eighth Amendment rights by placing restraints on him too tightly when transporting him to court. He also alleges that he was kept sitting in a hot van after being transported to court, was not provided a beverage with his lunch, was not allowed to get a drink and was not allowed to use the restroom, all of which he claims are in violation of the Eighth Amendment's prohibition against the infliction of "cruel and unusual punishment."  U.S. CONST. amend. VIII.

DePaola claims that before being transported to his court hearing, defendants Hartsock, Collins and Gilbert applied restraints on him.  According to DePaola, he

was handcuffed in front and leg shackled, and a black box was placed over the handcuffs and padlocked.  An electric stun belt was wrapped around his waist, and a waist chain was wrapped around his waist, through the stun belt, then through the black box, holding DePaola's hands secure to his waist.  A pair of hard plastic and strong fabric hand muffs were placed over his hands and velcroed tightly to his wrists.  Three flex cuffs were then placed tightly, binding his wrists together to act as a second pair of handcuffs.  DePaola alleges that he repeatedly told Hartsock, Collins and Gilbert that his restraints were "too tight and were hurting [his] wrists and hands."  DePaola claims that Hartsock told him this was the way the restraints had to be applied per policy and that he would get used to them once they were on the road.  (Complaint at 17).  DePaola alleges that after arriving at the courthouse, while sitting in the transport van, he complained "numerous times" that the restraints were "hurting [his] hands and wrists to … Wood, Davis, Phipps and Hartsock."  (Complaint at 18-19).  However, these complaints were largely met with "there is nothing we can do about it."  (Complaint at 19).  DePaola alleges that, at one point, after complaining several times that the flex cuffs were too tight and were cutting into his wrists causing them to "slightly bleed," Hartsock shifted them, but did not loosen them, stating that policy prohibited it. (Complaint at 19).  DePaola alleges that he suffered extreme pain, swelling and cuts on both hands and wrists.  He also claims he suffered nerve damage in his right thumb and index finger, and he suffers continued limited mobility in his right thumb.

While Hartsock recalled transporting DePaola to court on March 22, 2011, he stated that he did not remember DePaola telling him the restraints were too tight.  (Hartsock Affidavit at 1-2.)  He denied telling DePaola that the way the restraints were applied was per policy and that he would get used to them once they got on the road.  (Hartsock Affidavit at 2.)  Hartsock stated that, in order to

make certain restraints are not too tight, he slips his middle finger between the restraint and the offender's wrist or ankle. (Hartsock Affidavit at 2.) He stated that restraints are properly applied if he can slip his finger through the restraint. (Hartsock Affidavit at 2.)

Phipps also has provided a sworn affidavit, stating that she recalled neither transporting DePaola to court nor his complaints of the cuffs being too tight. (Phipps Affidavit at 1-2.) Davis provided sworn affidavit testimony, also stating that he did not specifically recall transporting DePaola to court. (Davis Affidavit at 1.) He stated that he did not have the authority to remove, adjust or otherwise alter an offender's restraints during or while on a transport. (Davis Affidavit at 2.) Davis stated that if DePaola's restraints were too tight, he would have needed to address this at the prison prior to transport. (Davis Affidavit at 2.) Lastly, Wood testified in his affidavit that he did not recall transporting DePaola on March 22, 2011, or that DePaola informed him that his restraints were too tight. (Wood Affidavit at 1.)

DePaola has provided medical records which show that he was seen by an institutional physician on March 22, 2011, the very day of the transport. (Docket Item No. 31, Exhibit B.) However, while the record shows that DePaola complained of low back pain, he voiced *no complaints* about restraints being applied too tightly or any injuries resulting therefrom. (Docket Item No. 31, Exhibit B.) Specifically, he did not complain of wrist pain, hand pain or any numbness, and no bruising, swelling or cuts to the hands or wrists were noted by the physician. (Docket Item No. 31, Exhibit B.) A week later, on March 29, 2011, a physician saw DePaola for complaints of numbness in the right hand. (Docket Item No. 31, Exhibit Q.) DePaola denied any problems with his left wrist.

(Docket Item No. 31, Exhibit Q.)  The physician noted no bruising or swelling and diagnosed probable neuropathic pain.  (Docket Item No. 31, Exhibit Q.)

As recently noted in *Chaplin v. Maas*, 2013 WL 1249173, at \*4 (W.D. Va. Feb. 1, 2013), it is not clear whether a claim by an inmate who asserts use of excessively tight restraints should be evaluated as one for the use of excessive force or as one challenging the conditions of confinement.  *See also Holley v. Johnson*, 2010 WL 2640328, at \*12-15 (W.D. Va. June 30, 2010).  That being the case, I will follow the lead of the *Chaplin* and *Holley* courts and analyze DePaola's claim under both standards, beginning with excessive force.  The unnecessary and wanton infliction of pain by a prison official through the use of excessive force upon an inmate has been clearly established as a violation of the Eighth Amendment's prohibition on cruel and unusual punishment for a number of years.  *See Hudson v. McMillian*, 503 U.S. 1, 5 (1992); *Whitley v. Albers*, 475 U.S. 312, 319 (1986).  The determination of whether the use of force by a prison official violates the Eighth Amendment includes both a subjective and objective component.  *See Williams*, 77 F.3d at 761 (citing *Wilson*, 501 U.S. at 302).  Not every malevolent touch by a prison guard amounts to a deprivation of constitutional rights.  *See Hudson*, 503 U.S. at 9 (citing *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)).  To meet the objective component in an excessive force case, an inmate must show that the force used was "nontrivial," *Wilkins v. Gaddy*, 559 U.S. 34, 39 (2010), given that "contemporary standards of decency always are violated … whether or not significant injury is evident."  *Hudson*, 503 U.S. 9.  "This is not to say that the 'absence of serious injury' is irrelevant to the Eighth Amendment inquiry."  *Wilkins*, 559 U.S. at 37 (quoting *Hudson,* 503 U.S. at 7).  In fact, the extent of the injury may suggest that "'the use of force could plausibly have been thought necessary' in a particular situation" or "provide some

indication of the amount of force applied." *Wilkins*, 559 U.S. at 37 (quoting *Hudson*, 503 U.S. at 7, 9). For example, "[a]n inmate who complains of a [mere] 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim." *Wilkins*, 559 U.S. at 38 (quoting *Hudson*, 503 U.S. at 9). As *Wilkins* clarified, it is the nature of the force "that ultimately counts" and provides the "core judicial inquiry" in an excessive force case. 559 U.S. at 37-38. In particular, courts must consider "whether [the force] was nontrivial and 'was applied … maliciously and sadistically to cause harm.'" *Wilkins*, 559 U.S. at 39 (quoting *Hudson*, 503 U.S. at 7).[10]

To meet the subjective component in an excessive force case, the inmate must show that the prison official applied force "maliciously and sadistically for the very purpose of causing harm." *Whitley*, 475 U.S. at 320-21. The inquiry under the subjective standard is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7. The Supreme Court in *Whitley* set our several factors which should be considered in determining whether prison officials acted maliciously and sadistically. In particular, the court should consider:

1) the need for application of force;
2) the relationship between that need and the amount of force used;
3) the threat "reasonably perceived by the responsible officials;" and
4) "any efforts made to temper the severity of a forceful response."

---

[10] *Wilkins* abrogated the Fourth Circuit's decision in *Norman v. Taylor*, 25 F.3d 1259, 1263 (4th Cir. 1994) (en banc), which held that "absent the most extraordinary circumstances, a plaintiff cannot prevail on an Eighth Amendment excessive force claim if his injury is *de minimis*." The *Wilkins* Court held that "[t]he Fourth Circuit's strained reading of [*Hudson v. McMillian* was] not defensible" and that *Hudson* "did not, as the Fourth Circuit would have it, merely serve to lower the injury threshold for excessive force claims from 'significant' to 'non-de minimis' – whatever those ill-defined terms might mean." 559 U.S. at 39.

*Williams*, 77 F.3d at 762 (citing *Whitley*, 475 U.S. at 321).

The Eighth Circuit has held, and it is a matter of common sense, that use of restraints on inmates outside of the prison setting "is eminently reasonable." *Haslar v. Megerman*, 104 F.3d 178, 180 (8th Cir. 1997). Thus, I find that the first and third *Whitley* factors do not suggest that the defendants acted maliciously and sadistically for the purpose of causing harm. With respect to the second factor, I find that, viewing the facts in the light most favorably to DePaola, the record indicates that DePaola's hand restraints were applied more tightly than necessary. This is because, according to DePaola, Hartsock did, in fact, shift the flex cuffs in response to DePaola's complaints, although he did not loosen them, stating that he was prohibited by policy from doing so. Therefore, I find that this factor favors DePaola. I find that the remaining factor, namely, any efforts made to temper the severity of a forceful response, weighs in favor of the defendants. In particular, DePaola himself alleges that Hartsock "shifted" the hand restraints after he complained of them being too tight. DePaola claims that Hartsock advised him that he could not loosen the restraints pursuant to policy. Even viewing the facts in the light most favorably to DePaola, I find that Hartsock's response of "shifting" the restraints was an effort to temper the "severity of a forceful response," i.e. the alleged application of hand restraints too tightly. Therefore, I find that three of the four *Whitley* factors suggest that the defendants did not act maliciously and sadistically for the very purpose of causing harm to DePaola.

Aside from these *Whitley* factors, however, I find that there is other evidence to suggest that the defendants did not act maliciously and sadistically in the application of DePaola's hand restraints on March 22, 2011. As the court noted in *Majette v. Geo Group, Inc.*, DePaola has not indicated that any of the defendants

had any reason to "bear him ill will." 2010 WL 3743364, at *6 (E.D. Va. Sept. 22, 2010). Additionally, all of these defendants have offered sworn testimony that they do not recall DePaola complaining of his hand restraints being too tight. In any event, Hartsock stated that in order to make certain that restraints are not placed too tightly, he slips his middle finger between the restraint and the offender's wrist. (Hartsock Affidavit at 2.) Davis provided sworn testimony that he does not have the authority to remove, adjust or otherwise alter an offender's restraints during or while on a transport, and if DePaola's restraints were too tight, he would have needed to address this at the facility prior to transport. (Davis Affidavit at 2.) Finally, the medical records offered by DePaola show that he saw a physician on the very day of the transport, but he did not voice any complaints regarding his hands or wrists. Instead, his complaints were related to lower back pain, and the attending physician made no mention of any cuts, swelling or bruising to DePaola's hands or wrists. (Docket Item No. 31-2, Exhibit B.) On March 29, 2011, a week after the transport, DePaola saw an institutional physician with complaints of numbness in the right hand, but he denied any problems with the left wrist. A physical examination revealed no bruising or swelling, and the physician diagnosed probable neuropathic pain, for which he prescribed Prednisone. (Docket Item No. 31-2, Exhibit Q.) Despite his claims of nerve damage to his right thumb and continued limited mobility thereof, DePaola has submitted no subsequent medical records to substantiate any such claims or any problems with his hands or wrists. All of this being said, I find that, to the extent that DePaola's claim that his hand restraints were applied too tightly is evaluated as a claim of excessive force, he has failed to show that defendants Hartsock, Collins, Wood, Davis and Phipps acted maliciously or sadistically for the very purpose of causing him harm.

Next, with respect to any conditions of confinement claim, an inmate must first demonstrate an objectively serious constitutional injury. *See Wilson*, 501 U.S. at 298. The Fourth Circuit has indicated that this is an extremely tough standard for the inmate to meet. *See Strickler*, 989 F.2d at 1382; *Hudson*, 503 U.S. at 9. Under the objective prong of an Eighth Amendment claim challenging the conditions of confinement, an inmate must demonstrate that the deprivation complained of was extreme and amounted to more than the "routine discomfort" that is "part of the penalty that criminal offenders pay for their offenses against society." *Strickler*, 989 F.2d at 1380 n.3 (quoting *Hudson*, 503 U.S. at 9). The resulting harm to the inmate is especially pertinent in determining whether a "distasteful condition" was sufficiently extreme to constitute an unconstitutional infliction of punishment. *Majette*, 2010 WL 3743364, at *7 (citing *Strickler*, 989 F.2d at 1381). Therefore, "[i]f a prisoner has not suffered a serious or significant physical or mental injury as a result of the challenged condition, he simply has not been subjected to cruel and unusual punishment within the meaning of the [Eighth] Amendment." *Strickler*, 989 F.2d at 1381.

In this case, the evidence shows no bruising or swelling, and no cuts were memorialized in any of DePaola's medical records. In fact, the very day of the transport, DePaola had an appointment with an institutional physician, but voiced no complaints of having been restrained too tightly or any resulting injuries. A week after the transport, DePaola complained of numbness, but there was no bruising or swelling. Finally, despite DePaola's contention that he continues to suffer from numbness and limited mobility of the right thumb as a result of these restraints being applied too tightly, he has not provided the court with any subsequent medical records related thereto. Given these circumstances, I find that DePaola has failed to show that any injuries he might have sustained were

sufficiently serious to support the objective component for his claim that the above-named defendants violated his Eighth Amendment rights by the manner in which they restrained his hands under a conditions of confinement theory.

For all of the above-stated reasons, I find that DePaola can show neither, under an excessive force analysis nor a conditions of confinement analysis, that the above-named defendants violated his Eighth Amendment rights by restraining his hands too tightly on March 22, 2011, and I recommend that the court grant summary judgment in favor of the defendants on this claim. That being the case, I further find that the defendants are entitled to qualified immunity on this claim, regardless of whether it is analyzed under an excessive force or a conditions of confinement theory.

Lastly, DePaola argues that defendants Davis, Wood, Hartsock and Phipps forced him to sit in the hot and humid transport van without air conditioning while he awaited his court hearing. He further alleges that his requests to use the restroom were denied, and he was told he could do so upon return to the prison. DePaola also alleges that he did not receive a beverage with his bagged lunch as he should have, and his requests to get a drink were denied by Wood, Davis and Hartsock, all of whom stated he would have to wait until he returned to the prison.

There is no doubt that these complaints by DePaola clearly fall within the conditions of confinement analysis. Therefore, the court must determine whether there was (1) a serious deprivation of a basic human need, which resulted in a serious or significant physical or emotional injury; and (2) deliberate indifference to prison conditions on the part of prison officials. *See Strickler*, 989 F.2d at 1379-81. DePaola must produce evidence that a particular defendant was made aware of

facts from which he could draw a reasonable inference that a substantial risk of serious harm existed, that he actually drew that inference and that he disregarded the risk by failing to take reasonable steps to abate it. *See Farmer*, 511 U.S. at 835-37. Here, DePaola alleges he was made to sit in a hot and humid van without air conditioning for approximately seven and one-half hours, which made him lightheaded and nauseated and caused headaches. In sworn affidavits, the defendants deny these allegations. Hartsock stated that the van was running with the air conditioning on throughout the wait. (Hartsock Affidavit at 2.) Davis stated in his affidavit that he has never left an offender inside of a hot van, noting that if the temperature was hot outside, the transport van would have been running with the air conditioning turned on. (Davis Affidavit at 1.) Likewise, Wood stated that he would not have left an offender sitting in a hot van. (Wood Affidavit at 1.) As stated previously, DePaola saw an institutional physician later that day for complaints of back pain. However, he voiced no complaints of being restrained in a hot and humid van for a prolonged period of time, resulting in headaches, lightheadedness and nausea. He also has provided the court with no evidence of any subsequent medical treatment as a result of being kept in these alleged conditions, nor has he alleged any lasting effects as a result of being so restrained. Given all of these facts and circumstances, I find that DePaola has failed to make the necessary showing of a serious or significant injury, and I recommend that the court grant the defendants' Motion on DePaola's § 1983 claim alleging that the defendants' actions of keeping him restrained in a hot and humid van for approximately seven and one-half hours violated his Eighth Amendment right to be free from cruel and unusual punishment.

DePaola next alleges that he was denied a beverage with his bagged lunch, and he was not allowed to get a drink while awaiting his court hearing. More

specifically, he contends that a juice, which was supposed to be provided with the bagged lunch, was not. (Complaint at 19.) He claims that even after he advised Wood, Davis and Hartsock that his bagged lunch had no drink, they stated he would get one when he got back to the prison. (Complaint at 19.) DePaola alleges that his nausea, headaches and dry mouth associated with the hot and humid conditions, were compounded by the denial of fluids for seven and one-half hours.

In his affidavit, Hartsock stated that there is a water fountain outside of the restroom where DePaola would have been able to get a drink in addition to the one provided in his lunch. (Hartsock Affidavit at 2.) Hartsock denied telling him that he would have to wait until they returned to the institution in order for him to have something to drink. (Hartsock Affidavit at 2.) Likewise, Davis stated that there is a water fountain just outside of the restroom where offenders can get water to drink. (Davis Affidavit at 2.) Wood stated that he did not recall DePaola asking him for water. (Wood Affidavit at 1.) I find that DePaola has, again, failed to make the necessary showing of a serious or significant injury resulting from the alleged denial of fluids for the duration of the transport to and from his court hearing. DePaola claims only that such alleged denial of fluids served to compound the lightheadedness, nausea and dry mouth and headaches he suffered as a result of being confined to the hot and humid conditions of the transport van. However, as already found above, DePaola fails to show that those injuries are sufficiently significant or serious within the meaning of an Eighth Amendment conditions of confinement claim. Therefore, I recommend that the court grant the defendants' Motion on DePaola's § 1983 claim that the denial of fluids for the duration of the transport to and from his court hearing on March 22, 2011, violated his Eighth Amendment right to be free from cruel and unusual punishment. I further find that the defendants are entitled to qualified immunity on this claim, as well.

DePaola next claims that he was denied use of restroom facilities during the transport and while awaiting his court hearing on March 22, 2011. More specifically, he claims that he informed defendants Wood, Davis and Hartsock that he had to use the restroom, but was told he would be able to do so when he returned to the prison. (Complaint at 19-20.) DePaola alleges that he was denied the use of a restroom for approximately five hours, and he suffered extreme, prolonged sharp pain in the bladder due to having to hold his urine for this time. While the court can find no published authority on this issue from this circuit or district, I find persuasive this court's holding in *Tyree v. Brooks*, 2009 WL 2232455, at *2 (W.D. Va. July 24, 2009). In that case, this court found that "[b]eyond not sustaining any resulting injury, the denial of bathroom privileges for just over five hours while being transported between prisons is not a denial of a minimal measure of life's necessities." Other courts have made similar rulings. *See Rouse v. Caruso*, 2011 WL 918327, at *12 (E.D. Mich. Feb. 18, 2011) (court found that denial of bathroom privileges for six to eight hours did not violate Eighth Amendment); *Abdur-Reheem-X v. McGinnis*, 1999 WL 1045069, at *2 (6th Cir. Nov. 12, 1999) ("[T]he Eighth Amendment does not require that prisoners enjoy immediately available … toilets."); *Smith v. Boyd*, 2012 WL 3230646, at *9 (M.D. Ala. July 5, 2012) (holding the Eighth Amendment not violated when an inmate was denied access to restroom for several hours while a search was being conducted, inasmuch as no injury was suffered); *Hernandez v. Battaglia*, 673 F. Supp. 2d 673, 677 (N.D. Ill. 2009) (denial of bathroom break during three- to five-hour period of cell shakedown did not state Eighth Amendment claim); *Owens v. Padilla*, 2008 WL 3916068, at *4 (N.D. Cal. Aug. 22, 2008); (confinement in prison barbershop for six hours without access to bathroom did not state Eighth Amendment claim); *Trevino v. Jones*, 2007 WL 710213, at *8 (N.D. Okla. Mar. 6,

2007) (use of restrooms only twice during eight-hour period does not constitute cruel and unusual punishment).

Using *Tyree* as guidance, I first find that DePaola's alleged denial of restroom privileges for approximately five hours does not constitute a denial of a minimal measures of life's necessities. *See* 2009 WL 2232455, at *2; *see also Rhodes*, 452 U.S. at 347 (Eighth Amendment prohibits prison officials from depriving inmates of minimal civilized measures of life's necessities). I further find that DePaola's claim that he suffered extreme, sharp bladder pain insufficient to state a serious or significant injury resulting from the alleged denial of restroom privileges for approximately five hours. Interestingly, despite seeing an institutional physician the same day of the transport at issue, he did not voice any concerns regarding such a denial of bathroom privileges, nor did he indicate any medical problems associated therewith. DePaola also does not allege that he suffered any lasting effects from this alleged denial. Thus, I find that, even viewing the evidence in the light most favorably to DePaola, the alleged denial of restroom privileges did not result in the requisite sufficiently serious or significant injury to sustain an Eighth Amendment claim.

It is for all of these reasons that I recommend that the court grant the defendants' Motion on DePaola's § 1983 claim alleging an Eighth Amendment violation based on the denial of restroom privileges for approximately five hours during the March 22, 2011, transport. I further find that the defendants are entitled to qualified immunity on this claim, as well.

# PROPOSED FINDINGS OF FACTS AND
# CONCLUSIONS OF LAW

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.  The VDOC is not recognized as a "person" subject to suit under 42 U.S.C. § 1983;

2.  The court should enter summary judgment in favor of the VDOC on DePaola's § 1983 claims;

3.  State officials are immune from suit in their official capacities for money damages under § 1983;

4.  The court should enter summary judgment in the defendants' favor on DePaola's § 1983 claims for money damages insofar as DePaola sues them in their official capacities;

5.  RLUIPA does not authorize damages against officials in their official capacities;

6.  The court should enter summary judgment in the defendants' favor on DePaola's claims under RLUIPA for damages against the defendants in their official capacities;

7.  A person's response to an inmate's grievance does not establish § 1983 liability;

8.  The court should enter summary judgment in Garman's favor on DePaola's § 1983 claim;

9.  The court also should find that Garman is entitled to qualified immunity on this claim;

10. There is no genuine issue of material fact, and the court should enter summary judgment in favor of defendants Ray, Rowlette, McCoy,

Tate and Gilbert on DePaola's § 1983 claim alleging an Eighth Amendment violation based on his placement in the B-3 pod;

11. The court also should find that defendants Ray, Rowlette, McCoy, Tate and Gilbert are entitled to qualified immunity on this claim;

12. There is no genuine issue of material fact, and the court should enter summary judgment in favor of defendants Ray, Rowlette, McCoy, Tate and Gilbert on DePaola's § 1983 claim alleging an Eighth Amendment violation based on the conditions of confinement in the B-3 pod;

13. The court also should find that defendants Ray, Rowlette, McCoy, Tate and Gilbert are entitled to qualified immunity on this claim;

14. There is no genuine issue of material fact, and the court should enter summary judgment in favor of defendants Ray, Rowlette, McCoy, Tate and Gilbert on DePaola's § 1983 claim alleging a Fourth Amendment violation based on the strip search protocol in the B-3 pod;

15. The court also should find that defendants Ray, Rowlette, McCoy, Tate and Gilbert are entitled to qualified immunity on this claim;

16. There is a genuine issue of material fact, and the court should deny summary judgment in favor of defendants Tate, Gilbert and Collins on DePaola's § 1983 claim alleging a Fourth Amendment violation, insofar as the strip searches in the B-3 pod were viewed by female employees at ROSP;

17. There is no genuine issue of material fact, and the court should grant summary judgment in favor of defendants Ray, Rowlette and McCoy on DePaola's § 1983 claim alleging a Fourth Amendment violation, insofar as the strip searches in the B-3 pod were viewed by female employees at ROSP;

18. The court also should find that defendants Ray, Rowlette and McCoy are entitled to qualified immunity on this claim;

19.     There is no genuine issue of material fact, and the court should grant summary judgment in favor of defendants Ray, Rowlette, McCoy and Tate on DePaola's § 1983 claim alleging a Fourteenth Amendment due process violation based on the lack of a hearing prior to placement in the B-3 pod;

20.     The court also should find that defendants Ray, Rowlette, McCoy and Tate are entitled to qualified immunity on this claim;

21.     There is a genuine issue of material fact, and the court should deny summary judgment as to defendants Ray, Rowlette, McCoy and Tate on DePaola's RLUIPA claim based on the muted DVD Jumu'ah services with no closed captioning and distorted images;

22.     There is a genuine issue of material fact, and the court should deny summary judgment as to defendants Ray, Rowlette, McCoy and Tate on DePaola's § 1983 claim alleging a First Amendment violation based on the muted DVD Jumu'ah services with no closed captioning and distorted images;

23.     There is a genuine issue of material fact, and the court should deny summary judgment as to defendants Phipps, Hartsock, Wood and Davis on DePaola's RLUIPA claim based on his inability to perform wudu and obligatory prayers during the March 22, 2011, court transport;

24.     There is no genuine issue of material fact, and the court should grant summary judgment in favor of defendants Phipps, Hartsock, Wood and Davis on DePaola's § 1983 claim alleging a First Amendment violation based on his inability to perform wudu and obligatory prayers during the March 22, 2011, court transport;

25.     The court also should find that these defendants are entitled to qualified immunity on this claim;

26.     There is no genuine issue of material fact, and the court should grant summary judgment in favor of defendants Collins, Phipps, Hartsock, Wood and Davis on DePaola's § 1983 claim alleging an Eighth Amendment violation based on his restraints being placed and/or kept on too tightly on March 22, 2011;

27.    The court also should find that these defendants are entitled to qualified immunity on this claim;

28.    There is no genuine issue of material fact, and the court should enter summary judgment in favor of defendants Davis, Wood, Hartsock and Phipps based on DePaola's § 1983 claims alleging Eighth Amendment violations based on the lack of a beverage in his bagged lunch, not being allowed to get a drink and not being allowed to use the restroom facilities while awaiting a court hearing on March 22, 2011; and

29.    The court also should find that these defendants are entitled to qualified immunity on these claims.

## RECOMMENDED DISPOSITION

Based on the above-stated reasons, I recommend that the court grant the defendants' Motion in part and deny the defendants' Motion in part.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed finding or recommendation to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence to recommit the matter to the magistrate judge with instructions.

Failure to file written objection to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable Samuel G. Wilson, United States District Judge.

The Clerk is directed to send copies of this Report and Recommendation to all counsel of record and unrepresented parties.

DATED: This 22nd day of July, 2013.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE