CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

AUG 16 2013

JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| ERIC J. DEPAOLA, | ) | Civil Action No. 7:12-cv-00139 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| TRACY RAY *et al.*, | ) | By: Samuel G. Wilson |
| Defendants. | ) | United States District Judge |

Plaintiff Eric J. DePaola, a Virginia inmate proceeding *pro se*, brings this action arising out of his incarceration at Red Onion State Prison ("ROSP") pursuant to 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.*, against the defendants, the Virginia Department of Corrections ("VDOC") and a number of its employees. The court referred the matter to United States Magistrate Judge Pamela M. Sargent for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). The Magistrate Judge has filed a thorough, sixty-one page report recommending that the court grant the defendants' motion for summary judgment on all but three of DePaola's claims. DePaola has filed an objection to the Report and Recommendation in which he makes repetitive arguments regarding the report's findings.[1] The defendants did not file an objection. When no timely

---

[1] Unsurprisingly, DePaola fails to mention the circumstances that likely led to his placement in the B-3 segregation pod. The defendants likely placed DePaola in segregation after he stabbed a prison guard. See DePaola v. Taylor, 7: 10cv398 (W.D. Va. Nov. 18, 2011). After that event, DePaola brought a §1983 suit claiming to have been the victim of a guard's excessive force. He overcame the defendants' motion for summary judgment and earned a day in court by lying about the circumstances surrounding his claim. DePaola alleged that prison guards pepper-sprayed him, threw him to the floor, and beat him, all while he "was not resisting nor . . . armed with any weapons of any form." See id. He reasserted that claim, under penalty of perjury, in his brief in opposition to the defendants' motion for summary judgment: "At no time during the . . . use of excessive force was the Plaintiff armed with any weapons, and/or resisting restraint, struggling or a threat." Id.
    At trial, however, the unassailed prison surveillance video showed DePaola retrieve a shank from a hiding place before charging Officer Christopher Dutton. DePaola and Dutton struggled with one another until another guard arrived on the scene and pepper-sprayed DePaola. Only then were the guards able to put DePaola on the ground and forcefully restrain him. At some point during the struggle, Dutton sustained a stab wound. After the jury viewed the surveillance video—which DePaola himself offered as evidence—he changed tactics and admitted that he had been armed with a shank. The jury returned a verdict in favor of the defendants.

objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation. Section 636, however, permits modifications and *de novo* determination of any portion of the Report and Recommendation of the Magistrate Judge, and the district judge "always retains authority to make the final determination" in non-consent matters. Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986); see also 28 U.S.C. § 636(b).

After reviewing the record, the applicable law, the recommendation of the Magistrate Judge, and DePaola's objections, the court adopts the Report and Recommendation in all respects, except as to the three remaining claims. The court dismisses the first of the three claims without prejudice for failure to state a claim pursuant to 28 U.S.C. § 1915(e)(2)(B), and grants the defendants' motion for summary judgment on the remaining two, with one narrow exception: the court will refer DePaola's request injunctive relief as to one of those claims to the Magistrate Judge for a hearing.

I.

At this stage the court recounts only the facts that pertain to the three remaining claims.

First, DePaola asserts a claim pursuant to § 1983 that officials violated his Fourth Amendment rights in subjecting him to strip searches "as female employees (i.e., guards and nurses, etc.) would be walking past able to view said search and [his] nakedness" while DePaola

---

In response to DePaola's current complaint, the defendants assert that the enhanced measures taken in housing DePaola are in place due to the "frequency, trend, and severity of his misconduct at ROSP, which includes over twenty institutional infractions," Defs.' Mot. Summ J. 6, ECF No. 27, and the restraints used in transport are applied "per policy," consisting of handcuffs, waist chains, leg irons, and a security box. Id. at 15; Aff. of Hartsock, ECF No. 27-5. DePaola acknowledges this misconduct, stating "that he has only 22 infractions in [the] entire 10 [years] of being in prison." Pl.'s Obj. to R&R 10, ECF No. 36.

was in the strip search cage. Compl. 12, ECF No. 1. He does not allege, however, that a female ever conducted a strip search or stood by and observed the performance of one.[2]

The Report and Recommendation found a genuine issue of material fact on DePaola's § 1983 strip search claim because, viewed in the light most favorable to DePaola, DePaola's allegations might be read to allege that female staff *could* have been in the vicinity of a strip search without a reasonable need for their presence. See Lee v. Downs, 641 F.2d 1117, 1120–21 (4th Cir. 1981) (holding that undressed inmates are not to be viewed by prison staff of the opposite sex when not reasonably necessary). The Magistrate Judge found a genuine issue of material fact precluding summary judgment as to two Red Onion supervisors because one ordered and approved the strip search policy allowing the presence of female staff during strip searches and served as building supervisor, and the other implemented that policy in the B-3 segregation pod.

Second, DePaola asserts claims pursuant to § 1983 and RLUIPA that while housed in the B-3 segregation pod, ROSP policy did not allow him to have a personal television in his cell, forcing him to "attempt to watch his required Jumah [sic] service" on a muted television projector with no closed-captioning and with images distorted by a "bright pod light . . . causing the picture to be faded therefore not allowing [him] to meaningfully see said service especially without straining [his] eyes." Compl. 15–16, ECF No. 1. ROSP policy permits B-3 segregation offenders to watch religious services on the pod television, which is a projection television without sound and with closed-captioning; however, the *Jumu'ah* services on DVD are without closed-captioning. Aff. of Ray, ECF No. 27-1. Consequently, those DVDs are projected without

---

[2] In response, the defendants assert that though ROSP's operating procedure allows females to be present at a cell during a strip search, it prohibits them from observing, watching, or supervising the search. The defendants contend that this policy serves a valid penological interest in hiring female guards and placing those guards efficiently throughout the facility and that any observation by female ROSP employees of DePaola's strip searches would have been, at most, incidental.

3

either sound or closed-captioning. In moving for summary judgment, the defendants contend that the lack of closed-captioned *Jumu'ah* programming did not prevent DePaola from practicing his religious faith in other ways, such as reading religious materials, speaking with the facility chaplain, participating in the Common Fare diet, and praying.

The Report and Recommendation concluded that there is a genuine issue of material fact and that the court should deny summary judgment as to certain defendants on DePaola's individual-capacity § 1983 and RLUIPA claims, finding that the DVD presentation of the *Jumu'ah* services placed a substantial burden on DePaola's exercise of religion "because he effectively was prevented from practicing an obligatory tenet of his religion." R&R 37, ECF No. 35. Applying a burden-shifting analysis under RLUIPA, the Magistrate Judge found that the presentation of a muted religious service program with no closed-captioning and distorted images furthered no compelling governmental interest. And analyzing DePaola's Free Exercise Clause claims under the rational-basis test from Turner v. Safley, 482 U.S. 78 (1987), the Magistrate Judge could not identify a valid, rational connection between a governmental interest and the practice of showing the *Jumu'ah* services on a muted television without closed-captioning and with distorted images. However, she did find that while the defendants satisfied Turner's second prong because there are suitable alternatives to the *Jumu'ah* service, the defendants did not satisfy Turner's third and fourth prongs because they did not address DePaola's suggestion that they provide *Jumu'ah* services on DVDs with closed-captioning. R&R 40, ECF No. 35.

Third, DePaola asserts claims pursuant to §1983 and RLUIPA because his physical restraints during transport to and from a court hearing at the Wise County Courthouse on March 22, 2011, prevented his performance of *wudu,* the practice of cleansing before prayer, and he

4

missed two of his required prayers. In moving for summary judgment, the defendants argued that VDOC's commitment to public safety required that DePaola remain securely confined or restrained at all times while away from the prison facility. This policy is effectuated by restraining offenders with handcuffs, waist chains, leg irons, and a security box during transports.

Though the Magistrate Judge found no violation of the First Amendment's Free Exercise Clause because there is an obvious "'valid, rational, connection' between keeping inmates properly restrained while off prison grounds and security," Turner, 482 U.S. at 89 (finding that a regulation which impinges on an inmates' constitutional rights can be sustained as "reasonably related" to a legitimate penological interest), the Magistrate Judge did find that "blanket statements regarding security are insufficient to make the necessary showing of a compelling governmental interest to support RLUIPA." R&R 42, ECF No. 35; see also Couch v. Jabe, 679 F.3d 197, 202 (4th Cir. 2012) (finding that the defendants must connect the policy restrictions at issue to the specific concerns, and show that these concerns are furthered by the policy); Smith v. Ozmint, 578 F.3d 246, 252 (4th Cir. 2009) ("conclusory, one-sentence explanation[s] do[] not, by [themselves], explain why the security interest is compelling"); Lee v. Gurney, No. 3:08cv99, 2009 WL 3109850, at *6 (E.D. Va. Sept. 25, 2009) ("Prison officials must supply adequate record evidence that the particular security concerns that prompted the policy are compelling and are advanced by their policy."). Accordingly, the Report and Recommendation found a genuine issue of material fact and recommended that the court deny summary judgment as to various individual defendants on DePaola's individual-capacity RLUIPA claim arising out of his transport.

## II.

The court concludes that DePaola's allegations concerning the possibility that female guards *could* have witnessed strip searches conducted within the B-3 segregation pod fails to raise a plausible claim for relief. The court finds that DePaola's complaint essentially alleges that a female guard *might* have viewed his strip search. It does not show an actual constitutional violation. Accordingly, the court dismisses this claim pursuant to 28 U.S.C. § 1915(e)(2)(B).

Section 1915(e) provides that in proceedings *in forma pauperis*, "the court shall dismiss the case at any time if the court determines that . . . the action . . . fails to state a claim on which relief may be granted." Under Rule(8)(a)(2) of the Federal Rules of Civil Procedure, a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." To survive review, the claimant's "[f]actual allegations must be enough to raise a right to relief above the speculative level," and the pleading must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 570 (2007) (citation omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Plaintiffs must offer enough facts "to nudge[] their claims across the line from conceivable to plausible," Twombly, 550 U.S. at 570, and from which the court, calling upon "its judicial experience and common sense," can conclude that the pleader has "shown" that he is entitled to relief, Fed. R. Civ. P. 8(a); Iqbal, 556 U.S. at 679. While courts should construe a *pro se* complaint liberally and hold it "to less stringent standards than formal pleadings," the complainant "must plead factual matter that permits the court to infer more than the mere possibility of misconduct."

Atherton v. D.C. Office of Mayor, 567 F.3d 672, 681–82 (D.C. Cir. 2009) (internal quotation marks and citations omitted).[3]

The Fourth Circuit has held that undressed inmates have a right to privacy to not be viewed by prison staff of the opposite sex unless reasonably necessary. See Lee, 641 F.2d at 1120–21 (finding "reasonably necessary" to include responding to an exigent circumstance, like male officers extinguishing a fire in a naked woman's cell). Even "male prisoners are . . . entitled to judicial protection of their right of privacy denied by the presence of female guards stationed in positions to observe the men while undressed or using toilets." Lee, 641 F.2d at 1120.

Here, DePaola's complaint does not show that a female employee actually viewed him during a strip search or otherwise infringed his right to privacy. Rather, DePaola's complaint merely suggests that female officials *might* have been in the vicinity during a strip search. Even applying a liberal standard to DePaola's *pro se* pleadings, DePaola has not shown he is entitled to relief. Accordingly, the court *sua sponte* dismisses this claim pursuant to 28 U.S.C. § 1915(e)(2)(B).[4]

---

[3] "[A] judge must accept as true all of the factual allegations contained in the complaint." Erickson v. Pardus, 551 U.S. 89, 94, (2007) (citations omitted). Although the court liberally construes *pro se* complaints, Haines v. Kerner, 404 U.S. 519, 520–21 (1972), the court does not act as an inmate's advocate, *sua sponte* developing statutory and constitutional claims not clearly raised in a complaint. See Brock v. Carroll, 107 F.3d 241, 243 (4th Cir. 1997) (Luttig, J., concurring); Beaudett v. City of Hampton, 775 F.2d 1274, 1278 (4th Cir. 1985); see also Gordon v. Leeke, 574 F.2d 1147, 1151 (4th Cir. 1978) (recognizing that a district court is not expected to assume the role of advocate for a *pro se* plaintiff).

[4] Moreover, the sufficiency of a plaintiff's allegations in a § 1983 action is "inextricably intertwined with" and "directly implicated by" the defense of qualified immunity. Iqbal, 556 U.S. at 673. Under that defense, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). To meet this test, generally "there must be sufficient precedent at the time of [the defendant's] action, factually similar to the plaintiff's allegations, to put [the] defendant on notice that his or her conduct is constitutionally prohibited." McLaughlin v. Watson, 271 F.3d 566, 572 (3d Cir. 2001). It is the intentional, unnecessary viewing of a prisoner of the opposite sex that violates the

## III.

After recommending that the court enter summary judgment in favor of all defendants in their official capacities,[5] the Magistrate Judge found that several defendants were not entitled to qualified immunity on two remaining claims: the claim involving the presentation of the *Jumu'ah* service DVD, and the claim that he was unable to perform *wudu* and pray while on a transport from ROSP to a court hearing. After reviewing DePaola's complaint, the defendants' motion for summary judgment and supporting affidavits, and the Report and Recommendation, the court finds that the defendants have qualified immunity and may not be held liable in their individual capacities, and therefore grants summary judgment on the remaining claims.[6]

The First Amendment's Free Exercise Clause and RLUIPA prohibit substantial burdens on religious exercise. Lovelace v. Lee, 472 F.3d 174, 198–99 & n.8 (4th Cir. 2006). But in contrast to RLUIPA's compelling governmental interest/least restrictive alternative test, in the case of convicted prisoners the First Amendment permits free exercise restrictions that are "reasonably adapted to achieving a legitimate penological objective." Id. at 200 (quoting Young v. Coughlin, 866 F.2d 567, 570 (2nd Cir. 1989)). Thus, in the case of prisoners, the First Amendment affords prison officials greater latitude than RLUIPA. Id. n.8 (quoting Madison v. Riter, 355 F.3d 310, 314–15 n.1 (4th Cir. 2003)). The "reasonably adapted" test asks:

> whether there is a "valid, rational connection" between the prison regulation or action and the interest asserted by the government, or whether this interest is "so

---

constitutionally protected privacy interests the Fourth Circuit identified in Lee v. Downs, 641 F.2d 1117 (4th Cir. 1981).

[5] State officials sued in their official capacities are not "persons" within the meaning of 1983, Will v. Mich. Dep't of State Police, 491 U,S, 58, 71 (1989), and thus not subject to monetary damage liability. Likewise, RLUIPA does not authorize damages against an official in his or her official capacity, Madison v. Virginia, 474 F.3d 118 (4th Cir. 2006).

[6] The right to recover damages of any sort in an action under RLUIPA is unsettled. But, to the extent that RLUIPA provides such a remedy, an individual defendant, sued in his personal capacity may assert qualified immunity.

8

remote as to render the policy arbitrary or irrational"; (2) whether "alternative means of exercising the right . . . remain open to prison inmates"; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any "obvious, easy alternatives" to the challenged regulation or action, which may suggest that it is "not reasonable, but is [instead] an exaggerated response to prison concerns."

Id. at 200 (quoting Turner v. Safley, 482 U.S. 78, 89–92 (1987)). This approach gives deference to "the considered judgment of prison administrators, 'who are actually charged with and trained in the running of the particular institution under examination.'" O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987) (quoting Bell v. Wolfish, 441 U.S. 520, 562 (1979)).

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The inquiry is twofold: a court should determine whether any right was violated and also whether that right was clearly established at the time of the alleged violation. See Miller v. Prince George's Cnty., 475 F.3d 621, 626–27 (4th Cir. 2007). A court conducts the "latter inquiry by determining whether a reasonable officer would have understood that his conduct violated the asserted right." Id. at 627. The court may exercise discretion in deciding which of the two prongs to address first. Pearson v. Callahan, 555 U.S. 223, 236 (2009); see also id. at 237–45 (explaining that this approach eliminates the need for courts to address difficult and "essentially academic" constitutional questions).

The Supreme Court has explained that the operation of qualified immunity "depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." Anderson v. Creighton, 483 U.S. 635, 639 (1987). "For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which *any*

action that violates that Clause (no matter how unclear it may be that the *particular* action is a violation) violates a clearly established right." Id. (emphasis added). But determining, at that level of generality, whether a law is clearly established would "bear no relationship to the 'objective legal reasonableness' that is the touchstone of the [qualified immunity inquiry]" and it "would destroy 'the balance that our cases strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties,' by making it impossible for officials 'reasonably [to] anticipate when their conduct may give rise to liability for damages.'" Id. (second alteration in original). Thus, "the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."[7] Id. at 640. To determine, then, whether the official should have known that his action violated a right, the court must examine the facts "at a high level of particularity." Campbell v. Galloway, 483 F.3d 258, 271 (4th Cir. 2007).

Public officials are not liable for making "bad guesses in gray areas," Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992), and there are appreciably fewer analytical bright lines in the prison context where the law gives prison officials some latitude, and the decision-making process permits the balancing of various interests, see Benson v. Allphin, 786 F.2d 268, 276 (7th Cir. 1986) (noting that a constitutional rule "involving the balancing of competing interests" is "so fact dependent that the 'law' can rarely be considered 'clearly established'") (superseded on other grounds by amendment to the Federal Rules of Civil Procedure); see also Ridpath v. Bd. of Governors of Marshall Univ., 447 F.3d 292, 320 (4th Cir. 2006) (recognizing, in the context of First Amendment speech, the difficulty of finding a clearly established right

---

[7] "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." Anderson, 483 U.S. at 640 (citation omitted).

because interest-balancing is required) (citing McVey v. Stacy, 157 F.3d 271, 277 (4th Cir. 1998)); Torbeck v. Zoon, No. 96–1962, 1997 WL 532496, at *2 (4th Cir. August 29, 1997) (table decision) (recognizing the same in the context of procedural due process). With these precepts in mind, the court turns to the remaining claims.

### A.

DePaola's asserted right to participate in *Jumu'ah* services does not automatically lead to the conclusion that there is a clearly established right to view the *Jumu'ah* service in closed-captioning and without visual impediment, however minimal, or that the availability of other avenues of religious expression and observance will not suffice. There is no bright-line, clearly established right of which a reasonable officer would have known. Because officials are not liable for making "bad guesses in gray areas," Maciariello, 973 F.2d at 298, the court finds that the individual defendants are entitled to qualified immunity and grants the motion for summary judgment as to DePaola's individual-capacity claims for damages against them.

Having found that the individual defendants are entitled to qualified immunity, the only remaining issue is whether DePaola is entitled to an injunction ordering closed-captioning on the *Jumu'ah* videos, and the court will refer that narrow issue to the Magistrate Judge for a hearing and a full evaluation on the merits.[8]

### B.

DePaola claims that the restraints prevented him from performing two of his required daily prayers on the March 22, 2011, transport from ROSP to the Wise County Courthouse.[9]

---

[8] If, prior to a hearing on the issue, the defendants provide closed-captioning during *Jumu'ah* screenings, this issue is moot. However, nothing in this opinion should be construed as requiring the defendants to do so.

[9] DePaola does not indicate whether he communicated a prayer request to the officials conducting the transport. DePaola also requests injunctive relief coordinating with Wise County Courthouse to "ensure waits to conduct hearings are not prolonged" or establishing a waiting area inside the courthouse to avoid long waits in the

From the defendants' motion for summary judgment, it is clear that officials were following VDOC protocol in transporting DePaola to his court hearing. It is difficult to fathom a scenario that would suggest a clearly established right to some prayer ritual during a prison transport from a cell to a court appearance that requires lessening the transported prisoner's restraints.[10] Discerning no bright-line violations here, the court finds that the defendants are entitled to qualified immunity and grants the motion for summary judgment as to DePaola's individual-capacity claims against them.

### III.

For the reasons stated, the court overrules DePaola's objections with one narrow exception, adopts the Magistrate Judge's Report and Recommendation with modifications, and refers the issue of injunctive relief as it relates to closed-caption religious services to the Magistrate Judge for a hearing and full evaluation on the merits.[11]

**ENTER**: August 16, 2013.

UNITED STATES DISTRICT JUDGE

---

transport vehicle. DePaola does not connect this request with his *wudu* or prayer claims, and finding that his other claims have no merit, the court does not consider this request for injunctive relief further.

[10] Indeed, their prior experiences with DePaola likely counseled the decision to keep him restrained during the transport.

[11] Although the Fourth Circuit Court of Appeals has upheld RLUIPA against facial Establishment Clause challenges, see Madison v. Riter, 355 F.3d 310 (4th Cir. 2003), this case offers yet more stark examples of how RLUIPA, as applied, fosters government entanglement with religion. Cf. Lovelace, 472 F.3d at 216 (noting that RLUIPA can create "unnecessary tensions between the Free Exercise and Establishment Clauses") (Wilkinson, J., concurring in the judgment in part and dissenting in part); id. ("Whether or not the result posited by the majority would lead to an Establishment Clause violation in fact, it would surely generate difficult constitutional questions. At a minimum, the RLUIPA envisioned by the majority will lead to claims of discrimination among faiths. For example, prison administrators forced to provide specially tailored hearings and procedures risk the appearance of impermissibly 'singl[ing] out [] particular religious sect[s] for special treatment.'" (alteration in original) (citation omitted) (quoting Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet, 512 U.S. 687, 706 (1994))).